[Crim. No. 1720. In Bank.—January 8, 1913.]

## THE PEOPLE, Respondent v. THOMAS J. SMITH, Appellant.

CRIMINAL LAW—MURDER—EVIDENCE OF DYING DECLARATIONS—BELIEF OF IMPENDING DEATH.—In a prosecution for murder, it is the abandonment of hope and the expectation of certain and imminent death by the person injured, and the belief of the law that at such an awe-inspiring time, a man about to be called to account before his Maker, will tell the truth, that alone justify the reception in evidence of his dying declarations against the defendant.

ID.—REAFFIRMANCE UNDER BELIEF OF DEATH OF STATEMENT PREVIOUSLY MADE.—A statement of the deceased, made at a time when he was not under the belief of immediate and impending death, may afterward, while under the fear of death, be reaffirmed by him under circumstances entitling it to admission. Greater care, however, should be exercised by the trial court, and a more satisfactory showing of the declarant's condition of mind made manifest, than where the statement itself is uttered in the first instance under the circumstances required by the law.

ID.—EVIDENCE—REAFFIRMANCE OF STATEMENT NOT UNDER BELIEF OF DEATH.—In the present case, it is held that the evidence is conclusive that the statement of the deceased was not made originally under the circumstances contemplated by the law, and that the showing is wholly insufficient to establish that it was reaffirmed afterward under such circumstances. The fact that the deceased was dying, although significant, is not controlling. The fact of controlling significance is his belief that the hand of death was upon him.

ID.—INSTRUCTION—SELF-DEFENSE—MISTAKE AS TO EXTENT OF APPREHENDED DANGER—"JUDICIOUS MAN."—In a prosecution for murder, in which self-defense was pleaded in justification, an instruction that if the defendant "acted from reasonable and honest convic-

tions, he cannot be held criminally responsible for a mistake in the actual extent of the danger, when other judicious men would have been alike mistaken," is rendered objectionable from the use of the word "judicious," instead of the accepted word "reasonable."

Id.—"Ordinarily Courageous Man."—The use of the phrase "ordinarily courageous man," instead of the phrase "ordinarily reasonable and prudent man," in an instruction that "if one person kills another through mere cowardice or under circumstances which are not, in the opinion of the jury, sufficient to induce a reasonable and well founded belief of danger to life or of great bodily harm in the mind of an ordinarily courageous man, the law will not justify the killing on the ground of self-defense," is objectionable.

Id.—Threats Against Life—Attempt Coupled With Ability to Take Life.—An instruction "nor does the fact that one person had made threats against the life of another, though taken in connection with the fact that the threatener was of a violent and dangerous character, justify or excuse an immediate resort to deadly weapons, resulting in killing him, in the absence of some demonstration, real or apparent, of an attempt, coupled with ability, to take life," is objectionable in stating that the demonstration or attempt shall be "coupled with ability to take life," before the defendant may resort to a deadly weapon in his self-defense, instead of stating that the demonstration or attempt should be coupled with a real or apparent ability to take life.

Id.—Circumstantial Evidence.—Where there was only direct evidence of the homicide, and the fact of its commission was admitted, there was no occasion to instruct the jury upon the character and value of circumstantial evidence.

Id.—Reasonable Doubt—Erroneous Instruction.—An instruction that "a doubt to justify an acquittal must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case. If, after considering all the evidence you can say that you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt," is erroneous.

APPEAL from a judgment of the Superior Court of Sacramento County and from an order refusing a new trial. J. W. Hughes, Judge.

The facts are stated in the opinion of the court.

William Tomsky, and T. J. Crowley, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, for Respondent.

HENSHAW, J.—The defendant, charged with the murder of Charles Wolters, was convicted of murder in the second degree. From the judgment and from the order denying his motion for new trial he prosecuted his appeal to the court of appeals, where his appeal was denied. A hearing was ordered before this court for the further consideration of certain of the legal questions involved.

The *theory* of the prosecution, as outlined in the opening statement of the prosecuting attorney and in the instructions given by the court at the request of the prosecution, was that defendant Smith nursed a feeling of bitter hostility against Wolters; that about ten o'clock on Sunday, the fourth day of September, 1910, in the city of Sacramento, Smith purchased a pistol, lay in wait for Wolters, met him in front of the Western hotel, and then "without one word spoken by either side, by either the deceased or the defendant," drew his pistol and assassinated Wolters, or, at the time of firing "exclaiming at the same time 'you will not beat me out of another job, you son of a bitch,'" (both quotations are from the opening statement of the district attorney) shot Wolters to death.

By the defense it was contended that as early as half past five o'clock of that Sunday morning the deceased, in a saloon, had twice made an unprovoked savage assault upon the defendant, who was crippled in one hand, and that the defendant escaped serious bodily injury only by the intervention of bystanders; that the deceased made threats, both communicated and uncommunicated, to beat, injure, and kill defendant; that, still upon the morning of Sunday, the defendant made appeal to the police department of Sacramento for a warrant for the deceased's arrest, and was told to come back the next day, and, failing thus of police protection, purchased a pistol with which to defend himself; that defendant was employed as a solicitor or "runner" for the Western hotel; that he repeatedly avoided the deceased during the day, but that deceased hung about the hotel, threatening injury to the defendant and apparently seeking a conflict with him; that, leaving the hotel early in the evening in the pursuit of his regular business he was approached by the deceased, who had been standing on the sidewalk in front of the hotel, and who, with vile language of abuse, began to threaten him as he approached, and that, in fear of death or great bodily injury,

he drew his pistol and fired. The killing was thus admitted and the defense was self-defense.

The *evidence* of the prosecution bearing upon the homicide consisted of the testimony of the witness Simmons, who conducted a cigar store next to the Western hotel. He had seen deceased in front of the Western hotel about half an hour before the shooting leaning against a post upon the sidewalk. Witness was reading a newspaper, when he heard a pistol shot. Looking up, at the pistol shot, he saw Wolters falling off the sidewalk and into the gutter. "Smith was standing kind of sideways and after the first shot, why, he turned around and fired two more shots." When his eye first caught the scene, Smith was standing near to the wall of the building, between him and Wolters and about eight feet from the latter. He saw nothing of the affray before this moment of time, and heard no words spoken by either of the men.

Another witness, Perry, testified that he had a slight acquaintance with both the defendant and deceased; that passing the Western hotel he saw the defendant standing up against the wall, spoke to him and received no response, but as he passed the defendant "stepped right behind me and said to somebody—I didn't notice who it was—he says, 'you damned son of a bitch, you will not beat me out of another job,' and just then he fired." By the time the witness had turned, three shots had been fired, and the deceased was falling or had fallen into the gutter.

All the other evidence of the prosecution is contained in the dying declaration of Wolters, which was admitted in evidence over the objection of the defense. The matter of this dying declaration will require more detailed consideration. For the present it is sufficient to say that Wolters's statement is that the defendant shot him to death, the shooting being sudden, unexpected, and unprovoked.

For the defense, it was shown that both men were solicitors or "runners" for the same hotel, that the deceased, and not the defendant, had by the proprietor upon Saturday the 3rd of September been discharged. It was further shown that Smith had not been discharged from that or any other employment, and was at the time of the homicide still in the employ of the hotel. Also, it was shown by a mass of testimony that the reputation of Smith for peace and quiet was good and that

of the deceased very bad. Still further it was shown by testimony presumably disinterested, and certainly unimpeached, that upon the morning of the homicide the deceased, ugly and inflamed with liquor, had, between half-past five and six o'clock, demanded that Smith pay him $1.75 which he insisted Smith owed him; that Smith replied that he did not owe him the money, but would pay him for the sake of peace, and gave Wolters $1.75; notwithstanding this, that Wolters assaulted Smith and struck him, Smith making no resistance. The barkeeper who testified to these things as well as did Smith, declares that he pulled Wolters from Smith and protested against his assaulting an inoffensive man; that nevertheless, when the barkeeper had returned behind the bar, Wolters again assaulted Smith and again the barkeeper, with assistance stopped the assault and Smith left the saloon, Wolters saying as Smith left "If I had a gun I would kill that man." Evidence of other assaults and attempted assaults by Wolters upon Smith during the day are in evidence. It is in evidence also that after Smith had purchased his weapon he left at least two places upon the entry therein of Wolters, one the office of the hotel, another the adjoining saloon. Threats of violence against Smith by Wolters are also shown by other witnesses. Thus, witness Hyde testifies that during that day Wolters said, referring to Smith, "I will get him. I will make a good dog out of him yet." Another witness, Hoffman, testifies that upon the same day Wolters said, referring to Smith, that "He would lick him every time he met him in Sacramento; and if he left Sacramento and went to San Francisco he would go to San Francisco and lick him there; and if he went to New York he would follow him to New York and lick him there." And finally, there is the evidence of the witness Bascherini testifying for the defense, the one witness who, aside from the defendant himself, was an eye witness to the occurrences, immediately preceding the shooting. He testified that he was a boot black; that his boot black stand was in the immediate neighborhood of the place of the shooting; that he was there at work upon the evening of and at the time of the shooting; that he saw Smith standing by the wall; that Wolters was close to him, about two feet or two feet and a half away; that Wolter's attitude and appearance were those of an angry man; that he was shaking his head and his

lips were moving as though in speech, though he could not distinguish the words; that at this moment he turned to his work of polishing shoes and immediately thereafter heard the first shot.

Reverting to the evidence of the prosecution, it is manifest that the only testimony (aside from the dying declaration) tending to show the deliberate and unprovoked murder for which the prosecution contended, was given by the witness Perry, and that Perry's account needed material support for the reason that, while his testimony would abundantly justify the inference of a willful and cold-blooded murder, the testimony itself is lame and halting by reason of the language which he puts in the defendant's mouth. For, as has been stated, it would be strange for the defendant to have said to the deceased "You will not beat me out of another job" when the facts were that the defendant had not been beaten out of any job, and was still holding his position, while the deceased had been discharged and thus "beaten out of his job" but the day before.

Therefore it is that the evidence contained in the dying statement of the deceased becomes most material in the establishment of the crime charged and in the overthrowing of the self-defense asserted by the defendant in justification of his act. For, without the evidence of the dying declaration it cannot be said that the jury would have accepted the somewhat curious account given by the witness Perry.

The facts concerning and attending the dying statement are that a bullet from defendant's pistol had pierced the abdominal cavity from the front, passed through the body and lodging in the spine. The wound was necessarily fatal, and from it Wolters died about twelve o'clock the following day. He was taken to a hospital upon the evening of the shooting. The next morning the abdomen was much extended, peritonitis had set in and by the testimony of one of the physicians Wolters was irrational from the fever of that inflammation. However, by the testimony of the district attorney, who received the dying statement, and by the testimony of another physician, Wolters was rational and appreciated what was said to him. The district attorney called upon Wolters in the hospital about eleven o'clock on Monday morning. There came to the bedside of the dying man the district attorney,

his deputy, Mr. Brown, and Mr. Doan, the stenographic reporter. By the stenographic report the preliminary conversation is as follows:

"Charley, I am the district attorney and I want to take a little statement from you, if you feel like you can give it to us. Now Charley, are you pretty badly hurt?

"A. Well, by God, I don't know.

"Q. Well, do you think you are going to die?

"A. I hope not.

"Q. Well, how do you feel about it? Did the doctor tell you you didn't have much chance?

"A. No.

"Q. You know you are shot pretty bad, don't you?

"A. I presume.

"Q. The doctor said, Charley, that the chances are that you are going to die. Now, how do you feel about it?

"A. If he feels that way, I don't know.

"Q. You think you are going to die?

"A. Well, I can't say.

"Q. You feel pretty weak, do you?

"A. No.

Immediately following this the district attorney proceeded by questions to elicit from Wolters his version of the fatal affray. Certainly no word up to this time gives evidence that Wolters was answering these questions in the presence of death, in the prospect of "almost immediate dissolution," without expectation or hope of recovery. (*People* v. *Hogdon,* 55 Cal. 72, [36 Am. Rep. 30]; 1 Greenleaf on Evidence, sec. 158.) Moreover, in the course of the inquiries put to him by the district attorney, Wolters having stated that just before the shooting he was talking to a conductor on the sidewalk, is asked: "Is that conductor going to work today or tomorrow? A. I can get his name if I get better. So long as there is life there is hope."

At the conclusion of the district attorney's inquiry, Dr. White was called in from the operating room and had a conversation with Wolters, lasting about a minute and a half, in which he stated to Wolters that he was going to die. The doctor was asked what he said to the wounded man and answered "I told him he was in a dying condition and my opinion was that he was going to die." Asked what the

patient replied, he answered, "I don't know. In fact I have forgotten." Mr. Wachhorst, the district attorney, testifies: "Do you say that the wounded man expressed himself any more strongly as to his condition after the doctor had spoken to him than appears in this report or transcript by the reporter?

"A. Well, all I can say in response to that question is to repeat what he did say in response to the statement made by the doctor.

"Q. I understand you then, Mr. Wachhorst, to say that the wounded man said 'all right, doctor, I understand, go ahead.'

"A. Something to that effect, substantially so."

The testimony of Mr. Doan, the stenographic reporter, is found in the transcript of his notes. By them, what took place is the following:

"Now, Charley, you know I am the district attorney. A. Yes. Q. This is the shorthand reporter? A. Yes. Q. Now, of course, if you are going to die, Charley, we want to get a statement from you, you see, before you die. Now, the doctor will talk to you.

"(Dr. White talks to Wolters.) Mr. Wachhorst. Now Charley we won't bother you much more, but this is very important. Now, the doctor has advised you that you are going to die. Do you realize it now, Charley? A. Yes. Q. And you feel that you are pretty bad off. A. Yes. Q. Now, all that statement that you have made to us has been under the belief that you are going to die. A. Yes. Q. You have told us the whole story, have you? A. Yes, I can't tell any more. Q. What you have told us is the truth, is it? A. That is the truth. Q. The whole truth and nothing but the truth? A. Yes. Q. Now, Charley, before you die do you want to say anything more? A. No."

The conditions under which the declarations of a deceased may be received in evidence as a dying declaration, the anomaly which permits the reception of such evidence at all, have both received such elaborate exposition that it would be a waste of time to expatiate upon the subject. It is the abandonment of hope, the expectation of certain and imminent death, and the belief of the law that, at such an awe-inspiring time, a man about to be called to account before his Maker, will tell the truth, that alone have justified the reception of

such statements against a defendant who is thus deprived of his most valuable rights of confrontation of witnesses and cross-examination. (*People* v. *Sanchez*, 24 Cal. 17.) The extracts which we have quoted give evidence of an assiduous effort upon the part of the district attorney, by leading and suggestive questions, to evoke a declaration from the lips of the wounded man measuring up to the requirements of the law. But they show no more than this. That the man was injured unto death, that he was indeed in a moribund condition at the time the so-called statement was taken, are unquestioned facts; but that he appreciated this and made his declarations with a sense of the gravity of the situation and of the consequences of his words, we cannot for one moment believe. As has been said, and as will be further shown, the whole statement was made after the sick man's declaration that he did not know whether he was badly hurt or not, that he hoped he was not, that he didn't know whether he was going to die or not, and that he did not feel "pretty weak." In the course of his answers, as has been pointed out, he declares that "while there is life there is hope." Yet to the district attorney, at the conclusion of the interrogatories, he answered "Yes" to the most leading question: "Now, all that statement that you have made to us has been under the belief that you are going to die." Still further, the internal evidence of the asserted dying declaration may itself help establish the state of mind of the declarant and in this case does so. One cannot read the statement here offered, made up in all essential particulars, as it is, of leading questions, designed to draw particular answers from the witness, without becoming convinced that the sick man was either semi-irrational, as one of the physicians testified, or that from extreme illness or extreme recklessness, he was willing to answer any question as he thought the district attorney desired it to be answered. It may be well to make some quotations: "Q. How many shots did he fire at you? A. Two. Q. Two shots? A. Yes. Q. Well, he fired three shots, Charley? A. Well, that is all I know. Q. All you know, he fired two shots? A. Yes. Q. Struck you once in the stomach? A. Yes. Q. And once on the finger? A. Yes. Q. Now, Sunday you met him in the saloon there—in Cody's saloon—didn't you? A. Yes. Q. Did you have any trouble with him there? A. No. Q.

Did you strike him there? A. No. Q. Sure, Charley? A. I am sure. I will tell you, after he called me all the Dutch sons of bitches and all that, I think I gave him one punch, but that wasn't when the shooting took place. That was before. Q. Yes, in the morning? A. Yes. Q. Now, how many times did you strike him Sunday? A. Once. Q. That was in Cody's saloon? A. Yes, I guess it must have been. Q. You only struck him once, Charley? A. Yes. I am no fighting man. Q. That is the only trouble you had with him? A. That is all, because I refused to give him money. Q. Now, did he pay you the dollar and seventy-five cents in Cody's saloon? A. Yes, he did. Q. You hit him first, didn't you? A. He looked at me, and he said to me 'Here, you son of a bitch' he says, 'that is not the way I let you have the money that time.' Q. Well, when you struck him in Cody's saloon, did he strike you? A. Of course, he struck me. Q. Where did he strike you? A. In the face. Q. Can you move your face over this way? Is that where he struck you, down here (indicating)? A. Yes. Q. There is a mark here on the right temple. Is that where he struck you? A. Yes. Q. He struck you there, did he, Charley? A. Yes. Q. What time in the afternoon was the shooting, about, as near as you can remember? A. Oh, it was about half-past five—quarter past five, probably a quarter to six. Q. It was later than that, Charley; it was about seven o'clock. A. Well, it may have been. It was getting dusk. Mr. Brown: It was getting dark, wasn't it? A. Oh, boys, I want a drink of water. Mr. Wachhorst: Well, we will see if we can get you a drink, Charley. (Wolters was given a drink of water.) Mr. Brown: Charley, did Smith say anything to you before he commenced to shoot? A. Not a word. Q. Did you see him pull a gun or pistol or anything? A. No. Mr. Wachhorst: Q. Charley, did he call you any name when he shot? A. He says 'Take that, you ————.' Q. Then he shot the second time? A. Yes. Q. Did you walk toward him when he shot? A. I don't think I did. Q. You don't think you walked toward him at the second shot, do you? A. No. Mr. Brown: After you heard the first shot, did he come toward you then? Did you see him coming toward you? A. Yes. Q. Was he walking quickly or slowly? A. Well, he was trying to get

me more, don't you see?    Q. Where did he first hit you, if you
remember?    A. In the back.    Mr. Wachhorst: Did you have
your back toward him when he shot?    A. Yes.    Q. Did you
turn toward him then?    A. Why, of course, naturally.    Q.
Did you know that he was standing there when you walked
up?    A. No, no.    Q. You didn't know he was there at all?
A. No.    Q. You had no intention of doing him any harm, had
you?    A. No."

In the one breath, the deceased states that he saw the de-
fendant talking to a woman and the defendant saw him com-
ing down the street and walked toward him.    In the next he
says that he did not know that Smith was standing there when
he walked toward him. · In one sentence, in answer to the
question "Did Smith say anything to you before he com-
menced to shoot," he replies "Not a word."    Here Mr. Wach-
horst takes the interrogations away from his assistant, Mr.
Brown, with the question, "Charley, did he call you any name
when he shot?" And the witness answered, "He says, take
that you ————." Again he says that he had his back toward
Smith at the time Smith first shot him, that the first shot
struck him in the back.    He had previously testified that
Smith approached him from in front, and the physical fact
is that he was not shot in the back, but that the fatal wound,
unquestionably the first shot fired, struck him from the front
in the abdomen.

To sum up on this matter: It is not because the declarations
of the deceased were not in the first instance made under the
belief of immediate and impending death that they are inad-
missible.    It is recognized that a statement not so made may
under fear of death be reaffirmed by the declarant under cir-
cumstances entitling it to admission.    (*People* v. *Crews,* 102
Cal. 174, [36 Pac. 367].)    But certainly considering the
character of such evidence and the tremendous consequences
following to a defendant from its admission, considering fur-
ther that if a declaration is taken from the injured person
when he is not in fear of death, if subsequently he has aban-
doned hope and feels that death is imminent, he is frequently,
if not usually, in a debilitated state of mind and body, it is
not too much to say that a greater care should be exercised
by the trial court and a more satisfactory showing of the
patient's condition of mind made manifest in such a case,

than where the statement itself is uttered in the first instance under the circumstances required by the law. What, then, we do mean to say is that the evidence is conclusive that the statement was not made originally under the circumstances contemplated by the law, and that the showing is wholly insufficient to establish that it was reaffirmed afterward under such circumstances. The fact that the man was dying has, of course, its significance, but it is not the fact of controlling significance. The fact of controlling significance is his *belief* that the hand of death was upon him. (*People* v. *Cord,* 157 Cal. 562, [108 Pac. 511].)

The materiality of the evidence thus improperly introduced has been sufficiently commented on. In view of the new trial which must be ordered, certain instructions demand attention. In contemplation of the character of the evidence and the plea of self-defense in justification, the instructions given at the request of the prosecution could with advantage be made much briefer. As a part of an instruction the court charged that if the defendant "acted from reasonable and honest convictions, he cannot be held criminally responsible for a mistake in the actual extent of the danger, when other judicious men would have been alike mistaken." "Judicious" is here used, in place of the well accepted word "reasonable." Fundamentally, a defendant's conduct, it has been over and over said, is measured by the standard of what the ordinarily reasonable and prudent man would have done under the same circumstances. The introduction or injection of new words is without benefit and serves only to afford a ground of more or less reasonable complaint. The same may be said of the following instruction: "If one person kills another through mere cowardice or under circumstances which are not, in the opinion of the jury, sufficient to induce a reasonable and well founded belief of danger to life or of great bodily harm in the mind of an ordinarily courageous man, the law will not justify the killing on the ground of self-defense." Here, again, the court shifts the standard from that of the ordinarily reasonable and prudent man to that of the "ordinarily courageous man." It might be that the logician could establish that the ordinarily reasonable and prudent man is the ordinarily courageous man. It might be that the logician could not do this. But, again we say that nothing is gained

by the introduction before the jury of these new measures and standards.

The following instruction is. unhappily worded: "Nor does the fact that one person had made threats against the life of another, though taken in connection with the fact that the threatener was of a violent and dangerous character, justify or excuse an immediate resort to deadly weapons, resulting in killing him, in the absence of some demonstration, real or apparent, of an attempt, coupled with ability, to take life." Elsewhere the jury was properly instructed as to a defendant's right to rely upon appearances, if those appearances were sufficient to excite the fears of a reasonable man that he was then in immediate danger of death or great bodily injury at the hands of the deceased. But here the jury is told that the "demonstration *of* an attempt," (meaning probably demonstration or attempt) shall be "coupled with ability to take life," before the defendant may resort to a deadly weapon in his self-defense. This, of course, is not the law. It may be that the jury was not misled by this instruction. It is unfortunate, however, that inconsistent instructions should be given. What the court probably meant, and certainly should have said, is that the demonstration or attempt should be coupled with a real or apparent ability to take life. The court instructed the jury upon the distinction between direct and circumstantial evidence. There was not only direct evidence of the homicide in this case, but it was admitted. There was, therefore, no occasion to instruct upon the character and value of circumstantial evidence. The court further instructed the jury as follows: "A doubt to justify an acquittal must be reasonable, and it must arise from a candid and impartial investigation of all the evidence in the case. If, after considering all the evidence you can say that you have an abiding conviction of the truth of the charge, you are satisfied beyond a reasonable doubt." A like instruction was criticised and condemned in *People* v. *Schoedde*, 126 Cal. 376, [58 Pac. 859]. It certainly does not better the long approved instruction of Chief Justice Shaw.

None of the asserted errors in the rulings of the court admitting and rejecting evidence require detailed consideration. The rulings themselves were either correct or were without

prejudice to the defendant. But for the error of the court in admitting against the defendant the purported dying declaration of Wolters, the judgment and order are reversed and the cause remanded.

Melvin, J., Angellotti, J., Sloss, J., and Shaw, J. concurred.