[Crim. No. 4220.   Second Dist., Div. Two.   Oct. 20, 1948.]

THE PEOPLE, Respondent, v. CLARENCE D. DAWSON, Appellant.

86

Frederic H. Vercoe and D. L. Di Vecchio for Appellant.

Fred N. Howser, Attorney General, and Wm. E. James, Deputy Attorney General, for Respondent.

WILSON, J.—Defendant was charged with the crime of manslaughter—the killing without malice of one Eddie Hines. By stipulation he was tried to the court without a jury. He was found guilty as charged and sentenced to state prison. He has appealed from the judgment of conviction and from the orders (1) refusing to set aside temporarily his plea of not guilty for the purpose of moving to quash the commitment, (2) denying his motion for a new trial, (3) refusing his application for probation, (4) denying his motion in arrest of judgment.

Defendant relies for reversal of the judgment and the order denying a new trial chiefly upon the specification that the evidence is insufficient to sustain the judgment of conviction and that the court abused its discretion in denying the motion for a new trial.

At the date of the occurrence that is the subject of this opinion Walter A. English, a geologist, was the owner of the building and premises designated as No. 114 South Beaudry Avenue in Los Angeles. The building was not residential property but was maintained by Mr. English for business purposes, having therein his offices and laboratory together

with desks, filing cabinets, typewriter, photographic room and equipment, microscope and other property used by him in his profession. He owned the property adjoining on the south known as No. 120 South Beaudry Avenue, which was a duplex residence, the north portion of which was rented by him to defendant. Defendant has been a tenant in the property since 1942, and in addition was employed by Mr. English as custodian of the business building at No. 114 and was authorized to guard the property, to enter and care for the building, to open Mr. English's mail and to forward any checks that might arrive during the latter's absence. Defendant is engaged in mining and land development business and has resided in Los Angeles for the past 27 years.

On the property line between Nos. 114 and 120 there is a cedar hedge about 10 feet high. A chicken wire fence is interwoven in the hedge. There is a hole in the wire fence so close to the ground that one must go on hands and knees in order to crawl through it.

The evidence on behalf of the prosecution came from three boys who were the companions of decedent and from police officers who testified concerning statements made by defendant.

The evidence of decedent's three companions was adduced mainly by leading questions of the district attorney which called merely for affirmative or negative answers or practically put the answers in the witnesses' mouths. No objections were forthcoming from defendant's trial attorney—not those representing him on this appeal. The questions put to the three witnesses were similar in form and their testimony is so nearly identical that, as would be expected due to the character of the questions, it might have come from only one person instead of three. It may be epitomized in one statement without relating the evidence of each witness separately. The three witnesses and the decedent resided near the Beaudry Avenue buildings in question. Two of the boys were 14 years of age, the third was 15. They testified substantially as follows: About 2 or 3 o'clock in the afternoon the four boys decided to go to the building at No. 114 South Beaudry Avenue and play hide and seek; decedent, Eddie Hines, was to be "it"; they went to the front of the building; Eddie was left standing by a tree with his arm over his eyes as the other three boys departed; there was a hole or window in the front of the building at No. 114, about on a level with the ground, which opened into the basement; there was a screen that had been torn from in front of the window but they did not

tear it down; they had not been in the building during the morning of the day of the shooting; one of the boys suggested that they "go in there and hide"; they climbed into the opening and dropped down to the floor; (one of the boys said there was a pipe in the basement that they used in order to climb down; the police surveyor saw no pipes); it was dark in the basement, the only light coming through the small window through which they entered; they hid along the side of the wall in the basement and from where they were standing they could see the window through which they entered; Eddie Hines "peeked" in and at that time they heard someone say "Hey" and then heard a shot; they did not hear Eddie say anything; two of the boys ran up the stairs and out through the back door; the other boy remained in the basement for more than an hour when he departed by the same route; they did not touch anything in the basement and did not know what was there; they did not hear the voice say anything except "Hey." Two of the boys testified that just before the shot was fired they could see Eddie Hines' legs, and that he had his back to the window. Two of them testified they went to a market with their employer in the morning of the day in question and they had not been in the company of Eddie Hines during the morning. Their employer testified he took one of the boys with him to the market on that morning but did not remember that he had taken both.

The report of the autopsy surgeon given at the coroner's inquest was received in evidence by stipulation. The report showed that decedent was a Negro 14 years of age, height 5 feet, weight 85 pounds; there was an opening in decedent's body, circular in shape and 3/16ths of an inch in diameter, located in the upper portion of the chest, $2\frac{1}{4}$ inches to the left of the midline and $1\frac{5}{8}$ths inches below the shoulder line, almost overlying the clavicle; posteriorly, in the left side of the back, there was a bulging area 3 inches to the left of the midline and 4 inches below the shoulder line; the bullet was found to be lodged beneath the skin in the bulging area above described.

A police surveyor testified as follows: The vent leading into the cellar of the building at No. 114 is 2.3 feet wide and 1.4 feet high; the lower edge of the vent is 1.4 feet above the ground on the outside and is 5.8 feet from the floor of the basement; a bush covered the vent; evergreen trees and a chicken wire fence extended along the south property line of No. 114; one can see through the trees; there are two

holes in the fence sufficiently large that he crawled through them; the level of the property at No. 114 and No. 120 is practically the same; there was a light in the furnace room and without the light the room was dark; he saw no pipes that would enable a person to climb down; if anyone left the floor of the furnace room and ran up the steps he would have to detour in order to go out through the back door.

The evidence of decedent's father related to his age, weight and grade in school and shed no light upon the incident that resulted in his son's death.

Police Officer Shinbane testified that as he was passing the premises in question he heard a shot and saw decedent stagger to the pavement; someone was holding the boy's head; he walked up the steps and found defendant with a .22 caliber automatic in his hand; defendant gave the gun to the witness and stated to the officer that there were some prowlers on the place, a couple of them were still in the building, and he had shot the one in the front of the building; he did not say he had been threatened or he had shot in self-defense; he said he had come back from a trip and had found someone had been burglarizing the place; the witness did not go into the basement to ascertain whether any persons were there or to observe the conditions in the building.

Officer Harry Fremont testified that he and his partner, Al Shambra, answered a call at 120 South Beaudry Avenue; he allowed defendant to change his clothes and then they proceeded to the city hall; defendant made a statement to the officers in which he said he and Mrs. Dorn, his business associate, had returned from a trip to a mining project; he had been absent three days; he was the caretaker of the building at 114 South Beaudry Avenue, the owner of which was then in Alaska; he noticed a screen had been torn away from a vent in the building and while he was engaged in preparing a covering for the window from which the screen had been torn Mrs. Dorn called to him that three or four boys, either Mexican or Negroes, were entering the building; he left his work, procured his gun, and when he ran out through the front door he saw a boy standing by the vent; defendant yelled to the boy and the boy started coming toward him; defendant was behind a hole in a chicken wire fence between two cypress trees; the boy kept coming toward him and he fired the shot. The officer identified a photograph of the vent, showing the screen that had been torn away, the picture having been taken after someone had nailed boards over the vent; he also

identified a picture representing a hole in the chicken wire fence. Upon cross-examination the officer was asked whether defendant had told him he had said "Halt or I will shoot"; the witness thought defendant had made the statement but was not positive whether he had said "Halt." The witness testified that the only discrepancy "regarding the whole facts of the case" between defendant's statement to him and his testimony at the coroner's inquest was that defendant testified at the inquest he had not been warned that the persons breaking into the premises were boys, while in his original statement to the officer he had stated that Mrs. Dorn told him they were boys. The evidence of Officer Alphonso Shambra was similar to that of Officer Fremont.

Defendant's testimony was as follows: He was the custodian of Mr. English's business building at 114 South Beaudry Avenue, and had possession of keys to the building; each day while he was in Los Angeles he opened Mr. English's mail, removed checks therefrom and forwarded them to Mr. English in Alaska; he and Mrs. Dorn left for a trip to their mining project on July 17, 1947; before leaving he made a careful examination of the building inside and outside and observed that the wire screen which covered the window leading into the basement was in place; they returned to Los Angeles on July 22d, arriving at the premises in question about 2 o'clock p. m.; they discovered that their equipment stored in the rear of the premises at No. 114 had been tampered with; large latches on a concrete vault in which his electric dynamo was situated had been "thrown"; they immediately inspected the premises finding that the building had been burglarized and that entrance had been made through the window leading into the basement; the wire screen which had been securely fastened on July 17 had been torn off; cabinets and drawers in Mr. English's laboratory had been opened and the contents strewn about; locks had been tampered with and the contents of the premises were in great confusion; a microscope belonging to Mr. English was missing; there was a fresh gouge mark where an attempt had been made to "jimmy" the hasp of the vault; the door from the photographic dark room had been forced and a light was burning in the room; the keys on the typewriter had been jammed in a bunch; keys with identification tags were scattered over the floor; drawers of steel filing cabinets had been opened and the room was in a state of disorder; contents of a Gladstone bag had been scattered; his steel tool box had been dragged out and opened; rough

scars were on the floor; a Stan microscope which defendant had previously used was missing; matches were scattered about; the screen and cloth had been broken from the aperture leading into the basement from the outside; the screen was shiny and polished as though bodies had passed over it; defendant prepared to barricade the aperture and while he was sawing boards for that purpose Mrs. Dorn called to him that there were four fellows in the front of the building; defendant told her to observe them and ascertain whether they intended any harm and if so to call the police; shortly thereafter Mrs. Dorn said ''They are now in the building''; defendant got his gun from his home at No. 120; he looked through the hedge between the two buildings and saw a person with his head and shoulders inside the aperture in the basement of No. 114; he could see a brown arm which was the only indication of color; he went down on his knees to crawl through the hole in the chicken wire fence and hedge between the premises when the person pulled his head out of the aperture and turned around facing defendant; the branches of the trees forming a hedge obscured his vision to some extent and he could not see the person clearly; ·defendant called in a loud voice ''Halt, or I will fire''; instead of doing so the person rushed at defendant hunched over in a grappling position used in wrestling; defendant was on his knees and so enmeshed in the wire fence that he could not make a rapid retreat; he intended to hold the persons in the building until the police arrived; the person made a leaping advance toward defendant; because of defendant's vulnerable position he feared bodily harm; when the person was about 5 feet distant from defendant the latter fired upward not aiming particularly at the person but to frighten or stop him; the person (decedent) yelled, ''I am shot,'' and ran toward the steps; at the time the shot was fired there were branches of cedar trees between him and Hines which partially obscured them from each other; he fired the shot both for the purpose of protecting himself and to apprehend the person who he believed was associated with the others who had entered the building to commit burglary.

As reasons, in addition to the testimony above outlined, for defendant's fear that he was about to be attacked, evidence was introduced concerning previous disturbances, robberies, burglaries, assault with a deadly weapon and other crimes in the neighborhood committed by juvenile gangs and others; a robbery had been committed in a store only a short

distance from defendant's residence; two burglaries had been committed in Mr. English's building at No. 114 previously to the burglary that was committed while defendant was absent as above related; juveniles had to be driven away, with the use of guns, from a service station in the neighborhood. During the first week in July, 1947, defendant had called the police on three occasions to remove disreputable characters from the building at No. 114; in March, 1947, a dead body was found in a car in front of the same building; a juvenile battle had occurred near defendant's residence, and a store had been held up near by; he had driven some Pachucos from an adjacent filling station, and a cutting battle had taken place directly at the rear of his house and one of the victims had taken refuge in defendant's home, covered with blood.

Defendant did not tell the police officers the microscope was missing. His explanation was that he did not want to tell everything to Detective Fremont because he did not have confidence in the latter, since on the trip to the jail Fremont had said: "I am going to make it my business to send you to San Quentin because I have a boy 13 years old." He was practically corroborated by Fremont who admitted that he said "Well, you ought to be in San Quentin. I have a 13 year old boy myself."

At the time of the shooting defendant was 58 years of age; his health was poor; he drew permanent and total disability payments from the government and from an insurance company for chronic arthritis and suffered from hernia which required the wearing of a truss; he also suffered from heart trouble. Proof of defendant's condition came not only from him but from reports of the United States Veterans' Bureau which were received in evidence: (1) rejecting his application for United States Government life insurance because of disability consisting of "myocarditis, chronic, with partial heart block"; (2) awarding disability allowance; (3) awarding a pension for "heart disability" and for "disability of orchitis, chronic, which have been rated as permanently and totally disabling." In addition defendant has a large inguinal hernia and an incipient umbilical hernia which require his wearing a truss. At the time in question he was also suffering from an injury to the bone sheathing of his left arm. The foregoing evidence was not contradicted or even questioned at the trial.

Mrs. Dorn's testimony corroborated defendant's evidence as to the occurrences after their arrival at the premises from

the mine and concerning the condition of the interior of Mr. English's place of business. When she saw the four persons in the yard she notified defendant and he told her to see if they actually went into the building, and if so to call the police; she heard one of the boys say "Let's break in here again," and one of the boys said "No"; she heard two of them jump into the cellar; she told defendant they were actually in the building; she attempted to call the police but had some difficulty in obtaining the proper telephone connection; while she was attempting to make the call two of the boys came up the cellar stairs and ran behind her; she asked them where they were going and they said they were going out through the back door.

Mr. Aufderheide, who resided at No. 122 South Beaudry, which is the south half of the duplex in which defendant lived, testified that between 9 and 9:30 o'clock on the morning of the day of the shooting he had seen four boys on the premises at No. 114, and identified decedent, Eddie Hines, and two of his afternoon companions as three of them; he could not identify the fourth; just before the shot was fired he was sitting in his living room and heard footsteps in No. 120; he ran out through the front door; just before he reached the door he heard defendant shout "Stop" and a phrase which was indistinct, and then the shot was fired. He also testified he knew of a number of arrests that had been made at No. 114 and he had called the police a number of times himself because of drunken persons sleeping on the premises; in March, 1947, he saw the dead body of a murdered man in a car in front of No. 114.

Mr. English testified that one of the considerations for taking defendant as a tenant was that the latter would look out for the property and see that it was not burglarized or do something about it if it was; the building had been burglarized twice and the people who previously occupied No. 120 paid no attention to the burglars although they admitted they had seen them. Mr. English described the condition of his premises when he returned. He stated the Stan microscope, two fountain pens and a clinical thermometer, some books, scales and other items of property were missing, also his safe deposit key, the key to the vault in the building and keys to other doors.

Several witnesses testified that defendant's reputation for peace and quiet in the neighborhood was good.

██ Giving full effect to the evidence it is insufficient to sustain the judgment of conviction when considered in connection with the relevant provisions of the Penal Code and the decisions of the courts applying such provisions in like cases.

Defendant's act did not constitute manslaughter within the definition of that term contained in section 192 of the Penal Code.* It is not contended that defendant's act comes within subdivision 1. The evidence, as we have pointed out, does not establish the commission of an unlawful act, or of a lawful act in an unlawful manner or without due caution and circumspection. Defendant's purpose in the first instance was to protect the property of which he was custodian and to prevent any unlawful act thereon; second, to apprehend and hold for the police the persons who had entered the premises and who defendant had reason to believe, had entered for the purpose of committing burglary. When defendant first observed the decedent the latter was in a position indicating that he was about to join his companions in the basement. While exercising his duty as guardian of the property and his duty as a citizen to apprehend persons who are observed in the commission of a crime (Pen. Code, § 837), the sudden acts of decedent indicated his intent to commit a physical assault on defendant. Homicide is justified when committed by a person (a) when resisting an attempt "to commit a felony, or to do some great bodily injury upon any person"; (b) "when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished"; (c) "When necessarily committed in attempting by lawful ways and means, to apprehend any person for any felony committed, . . ." (Pen. Code, § 197.)

"Lawful resistance to the commission of a public offense may be made: 1. By the party about to be injured; . . ." (Pen. Code, § 692.) "Resistance sufficient to prevent the offense may be made by the party about to be injured: 1. To

---

*"§ 192. Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

1. Voluntary—upon a sudden quarrel or heat of passion.

2. Involuntary—in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection; provided that this subdivision shall not apply to acts committed in the driving of a vehicle."

(Sub. 3 refers to manslaughter committed in the driving of a vehicle and is not applicable to this case.)

prevent an offense against his person, . . ." (§ 693.) "Any necessary force may be used to protect from wrongful injury the person . . ." of one's self. (Civ Code, § 50.) "A private person may arrest another: 1. For a public offense committed or attempted in his presence . . ." (Pen. Code, § 837.) "The person making the arrest must inform the person to be arrested of the intention to arrest him, . . . except when the person to be arrested is actually engaged in the commission of or an attempt to commit an offense, . . ." (§ 841.)

The evidence shows that defendant was at first resisting an attempt to commit burglary, a felony, and intending to arrest the offender, there being reasonable ground to apprehend that Eddie Hines designed to commit the crime and that there was imminent danger that such design would be accomplished. An instant later defendant was lawfully resisting another public offense, to wit, an assault upon himself. In defendant's practically helpless situation his resistance was no greater than was sufficient and necessary to prevent the assault upon him. Defendant was attempting to arrest Hines for what appeared to be an attempt and an intent to commit burglary in defendant's presence. While defendant did not inform Hines that he intended to arrest the latter he did call upon him to halt. Under the circumstances then existing and owing to the lack of time within which defendant could have informed Hines that he was to be arrested, and the cause of the arrest, the demand to halt was sufficient. In this situation regard must be given to the fact that defendant knew he would be unable to cope with his attacker or to defend himself in physical combat.

■ Where an attack is sudden and the danger is imminent a person may increase his danger by retreat. In such case he may stand his ground and slay his attacker even though it be proved that he might have more easily gained safety by flight. (*People* v. *Newcomer*, 118 Cal. 263, 273 [50 P. 405]; *People* v. *Hecker*, 109 Cal. 451, 463 [42 P. 307, 30 L.R.A. 403]; *People* v. *Ye Park*, 62 Cal. 204, 208; *Beard* v. *United States*, 158 U.S. 550, 560 [15 S.Ct. 962, 39 L.Ed. 1086, 1090].) Necessity is deemed to exist when an innocent person is placed in sudden jeopardy. "[W]here the peril is swift and imminent and the necessity for action immediate . . . the law does not weigh in too nice scales the conduct of the assailed, and say he shall not be justified because he might have resorted to other means to secure his safety." (*People* v. *Hecker, supra,* at p. 467.)

■ The evidence in this case fully satisfies these rules found in the decisions: (1) Not only must the defendant have believed himself to be in peril but, as a reasonable person, he must have had sufficient grounds for such belief. (*People* v. *Glover,* 141 Cal. 233, 238 [74 P. 745]; *People* v. *Herges,* 14 Cal.App. 273, 276 [111 P. 624]; *People* v. *Albori,* 97 Cal. App. 537, 544-545 [275 P. 1017].) ■ (2) Defendant was entitled to act upon appearances, and if the conduct of decedent was such as to induce in the mind of a reasonable man, under all the circumstances then existing and viewed from the standpoint of the defendant, the fear or belief that death or great bodily harm was about to be inflicted by decedent upon defendant, it does not matter whether such danger was real or apparent. (*People* v. *Thomson,* 145 Cal. 717, 720 [79 P. 435]; *People* v. *Hatchett,* 63 Cal.App.2d 144, 156, 158 [146 P.2d 469].) ■ (3) If defendant acted from reasonable and honest convictions he cannot be held criminally responsible for a mistake in the actual extent of the danger, when other reasonable men would alike have been mistaken. (*People* v. *Smith,* 164 Cal. 451, 462 [129 P. 785].)

Defendant had reason to believe, and from all the evidence we must conclude that he did believe, he was in danger of bodily injury which might be serious or even result in his death. An apparent and actual necessity existed which would lead any reasonable man to be in such fear of grave results to himself that he would be justified in resorting to self-defense and to use such force as he believed was necessary to protect himself from the encounter which seemed to be imminent.

The prosecution's evidence of the events before and at the time of the shooting was the testimony of decedent's three companions above related which was repeated by them in response to leading questions, as we have already pointed out. The other evidence for the prosecution consisted of testimony of the police officers concerning defendant's statements made to them. Such statements did not differ from the evidence given by him and Mrs. Dorn at the trial. A careful examination of the entire record, coupled with a consideration of the arguments contained in the briefs, particularly that of the attorney general, has convinced us that the evidence is insufficient to sustain the judgment of defendant's guilt of the crime of manslaughter. It does not dispel the presumption of innocence nor does it remove the reasonable doubt of defendant's guilt which persists throughout a trial of one

charged with a crime. In reaching this concluson we have not overlooked the rule that all intendments are in favor of the verdict and that ordinarily a reviewing court is limited to a determination of whether there is substantial evidence supporting the verdict which is not inherently improbable.

Since defendant was in a kneeling position on the ground and entangled in the chicken wire fence, and since the bullet entered decedent's body 1⅝ inches below the shoulder line and was found beneath the skin 4 inches below the shoulder line it is manifest that Eddie Hines was in a stooping or crouching position at the time the bullet struck him. The downward course of the bullet fully corroborates defendant's evidence as to the respective positions of himself and the decedent when the shot was fired. This physical fact impeaches the testimony of the three boys that Hines was in a standing position when he received the wound. If he had been standing and defendant kneeling the bullet would have taken an upward instead of a downward course in his body, and if both had been standing it would not have gone downward. The testimony of the boys is contradicted by facts in another particular: They testified that they had not been in the basement at any time previously, yet two of them, according to their own statements, had no difficulty in finding their way up the stairway and out through the back door. Their response to Mrs. Dorn, when she asked where they were going, that they were "going out the back door," indicated their familiarity with the premises. The police surveyor stated that anyone going from the basement to the first floor would not have a straight exit but would have to do some detouring.

The uncontradicted evidence furnishes complete justification for defendant's adoption of the course he pursued. Defendant having been employed by Mr. English as custodian for the express purpose of guarding the premises, and Mrs. Dorn having seen the boys in the yard and having heard one of them say "Let's break in here again," he had reason to believe and evidently did believe that another burglary was about to be committed. Such belief, based on the facts then within his knowledge, justified him in procuring his gun for the purpose of protecting the premises from depredations similar to those that had been committed during his absence at the mine and on other previous occasions referred to in the evidence. He had been told by Mrs. Dorn that some of the persons she had seen in the yard had gone into the building

and he saw Hines with his head in the window which would lead him to no other conclusion than that the latter was about to follow the others into the basement. He testified that he intended to arrest the persons in the building and the person whose head was in the window and hold them until the police arrived. Such was the right and duty of any citizen who sees that a felony is being committed. Defendant's warning to decedent to halt was unheeded. Instead, Hines started toward defendant in an attitude that indicated the former's intent to commit an assault on defendant. The latter had a right to protect himself from attack, especially in view of his kneeling position from which he was unable to extricate himself by reason of his enmeshment in the wire fence. This would have been his right if his state of health had been normal. The uncontradicted proof concerning his health and his ailments, furnished by evidence other than his own, shows his inability to enter into physical combat or to withstand an attack. He knew of his disabilities and he knew that the neighborhood was infested with a criminal element both adult and juvenile. No time was given him to deliberate but, as was his right, he no doubt thought of all those conditions in the split second in which he was required to act. He was not required or expected to remain in a precarious position until he, in a kneeling and practically helpless situation, was assaulted by a person who was mobile and was leaping and lurching toward him in a stooping attitude of attack, especially after the latter had been specifically warned to halt.

The evidence given by defendant and Mrs. Dorn was uncontradicted and unquestioned. Their statements made to the police officers and their testimony in court regarding the burglary and the condition of Mr. English's building were apparently accepted by the officers as true. They made no examination of the premises for the purpose of ascertaining whether defendant's statements were true. Officers were on the ground a few minutes after the shooting, yet there is no evidence that they entered the building or made any investigation of the burglary.

The attorney general argues that the size of decedent indicated that he was only a boy. He was 5 feet tall. Many adults are no taller. Defendant did not have sufficient time to consider whether his assailant was a boy or a man. Furthermore, the abundant evidence of the previous presence in the neighborhood of ruthless juvenile criminals would remove this feature of the argument from serious consideration. ▮ We

may take judicial knowledge of the fact that atrocious crimes are committed by boys of tender years since the newspapers almost daily recount such crimes and many of the offenders reach the trial courts and their cases come into the courts of review. Hence the fact that Eddie Hines was a boy need not be given any weight.

The judgment and the order denying a new trial are and each of them is reversed. The appeals from other orders are dismissed.

Moore, P. J., and McComb, J., concurred.

A petition for a rehearing was denied October 29, 1948, and respondent's petition for a hearing by the Supreme Court was denied November 18, 1948. Edmonds, J., Carter, J., and Spence, J., voted for a hearing.