[Crim. No. 10333. First Dist., Div. One. Oct. 1, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK A. CISNEROS, Defendant and Appellant.

400

### COUNSEL

James T. Hendrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, W. Eric Collins and Nancy S. Reller, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

**SIMS, J.**—Defendant has appealed from a judgment sentencing him to state prison following his conviction of murder of the second degree (Pen. Code, §§ 187, 189). Having reviewed the various contentions made by defendant as set forth below this court concludes as follows: (1) there was no error in the finding that defendant was competent to stand trial, or in the proceedings leading to that finding; (2) the evidence was sufficient to sustain the verdict and judgment; (3) there was no error in failing to give instructions concerning an accomplice and the necessity of corroboration of an accomplice's testimony; (4) there was no error in failing to instruct the jury with respect to mistake of fact, or (5) with respect to the defense of others; (6) there was no prejudicial error in failing to relate the court's instructions on voluntary and involuntary manslaughter to the defense of diminished capacity; (7) there was no error in the verdict forms submitted to the jury; (8) there was no error in the instructions on reasonable doubt and the defendant's right to an acquittal; (9) there was no prejudicial error in the instructions on implied malice and second degree murder; and (10) the record fails to show that defendant was denied the effective assistance of counsel. The judgment must be affirmed.

### I

On May 1, 1969, the defendant was arraigned on an information charging him with murder in violation of section 187 of the Penal Code. He appeared with counsel and entered a plea of not guilty. The court, at whose suggestion it does not appear, suspended criminal proceedings and appointed two psychiatrists, Dr. Terry and Dr. Sowers, to examine the defendant to determine whether there was any doubt concerning the competency of the defendant to understand the nature of the proceedings against him and to cooperate with his counsel in his defense, as contemplated by section 1368 of the Penal Code.

On May 15, 1969, the parties stipulated that the reports of the foregoing psychiatrists could be received in evidence and that the court could make a finding on those reports. At the hearing defendant's counsel urged the court to put more emphasis on the report of Dr. Sowers, than that of Dr. Terry because the latter had only interviewed the defendant for 5 or 10 minutes and because his report seemed "rather inconsistent." The court replied, "Even Dr. Sowers doesn't say he's a 1368." Whereupon defendant moved to have two additional psychiatrists appointed. The prosecutor objected and the court observed, "Mr. Perry, let me tell you that there isn't a psychiatrist that I know—and I know many of them—in whose judgment I have greater confidence than James G. Terry. I've known him for over twenty-five years."

Defendant's counsel then explained that his position was that he wanted a private psychiatrist from Walnut Creek to examine the defendant; that the defendant's family had secured funds for such an examination; and that he wanted the matter continued for two weeks.

The court replied that it could have no objection to the defendant's securing an examination by a private psychiatrist; that nevertheless it was going to then make a finding that the defendant was sane within the meaning of section 1368; and that even if a private psychiatrist indicated that the defendant was not competent to stand trial, such a finding would only create a conflict with the findings of Drs. Sowers and Terry.

Thereafter on July 9, 1969, the defendant entered an additional plea of not guilty by reason of insanity, and pursuant to the provisions of section 1027 of the Penal Code Dr. Sowers and Dr. Rapaport were appointed as psychiatrists to examine the defendant and to investigate his sanity. On September 29, 1969, in the department to which the case was assigned for trial, the issue of the defendant's competency to stand trial was submitted, pursuant to stipulation of counsel, to a second judge on the basis of the reports filed pursuant to the second appointment. The trial judge found that the defendant was competent to stand trial. The defendant then withdrew his plea of not guilty by reason of insanity.

The defendant now contends that he was denied due process of law and a fair and impartial trial, and that the trial court committed reversible error at the initial hearing to determine his competency to stand trial because of the predisposition of the court to favor Dr. Terry's opinion, and its failing to grant his motion for the appointment of additional independent psychiatrists, including a continuance to secure one of his own selection.

That there is no merit to this objection on appeal is apparent from the

record. In the first place there is nothing in the record to demonstrate that there was anything brought to the attention of the arraigning judge which would give rise to, or that he ever entertained, a doubt as to the sanity of the defendant, as distinguished from a request to, or a belief on the part of, the arraigning judge, that an investigation be made to determine whether such a doubt existed. (See *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 282-288 [61 Cal.Rptr. 644, 431 P.2d 228] [cert. den. (1968) 393 U.S. 861 (21 L.Ed.2d 128, 89 S.Ct. 139)]; and *People* v. *Merkouris* (1959) 52 Cal.2d 672, 678-681 [344 P.2d 1] [cert. den. (1960) 361 U.S. 943 (4 L.Ed.2d 364, 80 S.Ct. 411)]. Cf. *People* v. *Pennington* (1967) 66 Cal.2d 508, 515-521 [58 Cal.Rptr. 374, 426 P.2d 942].) Assuming the existence of such a doubt, the defendant by stipulating that the court resolve the matter on the basis of the two original reports waived his right to confront and cross-examine the reporting psychiatrists, and to demand and have a trial by jury on the issue of his competency to stand trial. (See *People* v. *Hill* (1967) 67 Cal.2d 105, 113-117 [60 Cal.Rptr. 234, 429 P.2d 586] [cert. den. (1967) 389 U.S. 1009 (19 L.Ed.2d 607, 88 S.Ct. 572)].) By the same token he waived his right to present further evidence on the issue. The judge's confidence in Dr. Terry could not nullify the foregoing conclusions. It would be strange for the court to appoint someone in whom it did not have confidence.

If it could be considered an abuse of discretion to refuse to set aside the stipulation and waiver so that the defendant could secure an expert of his own choosing, any prejudice occasioned thereby was dissipated by the proceedings which followed. No attempt to produce the testimony of an independent psychiatrist was made at the time of the second submission of the issue of the defendant's competency to stand trial to the trial judge. So far as the record shows all three psychiatrists whose reports were used believed the defendant was competent to stand trial. There is nothing in the record to the contrary. There is no merit to defendant's present contention.

## II

The uncontradicted evidence in this case shows that: the Caucasian victim of the homicide, Jesse A. Welch, picked up John Florez, a Caucasian acquaintance of seven or eight years who was visiting in the bay area, about 6 p.m. on March 18, 1969; they spent the evening and early morning hours in Hayward, San Francisco and Oakland playing pool and drinking beer (the victim had a blood alcohol reading of .02 percent ethyl alcohol indicating he was under the influence of that drug); at about 1:30 or 2 a.m. they made an assignation at a nearby hotel with two women

they met on the street; a dispute developed between Welch and his partner over money; this dispute was continued out on the street after all left the hotel; the defendant intervened; an argument, punctuated by one or two shots fired by the defendant into the ground, occurred between Welch and the defendant in the street between the defendant's car and Welch's car; it culminated in the fatal shooting of Welch, at the driver's side of defendant's vehicle, by a bullet which was fired over and through the roof of the defendant's convertible from the passenger's side; the defendant and his companions fled; police, who were near the scene and heard the shots, observed and broadcast a description of the vehicle; and the defendant and others were apprehended as a result of a speedy pursuit. Defendant contends that the evidence is insufficient to establish that he was the person who fired the fatal shot.

The witnesses for the prosecution, present at the shooting, in addition to Florez, were Sherry Young, the woman with whom Welch had the dispute, and Willie Harris, an occupant of the defendant's car. Harris had plead guilty to being an accessory after the fact to the homicide, and had received probation without any jail sentence as part of an agreement to testify against the defendant. The defendant did not testify but presented the testimony of Melvin Carter, a bystander. Neither side called Jewell Johnson, who was a passenger in the rear seat of defendant's car at the time of the occurrence, and who was identified when his car was stopped after the chase following the shooting. The prosecution also offered evidence which showed that: Harris was driving the defendant's car at the time it stopped; a .25 caliber automatic pistol was found along the route followed by defendant's car in its flight; the gun had one live round jammed in the chamber, and one left in a seven-round clip; four cartridge shells found at the scene, the fatal bullet recovered from the victim's body, and two bullets recovered from the victim's car were all fired from the weapon which was found; the bullet which killed the victim entered his body at an angle of 12 degrees down; a second bullet, which was not recovered, had gone through the victim's left kneecap; a bullet had apparently gone through the top of defendant's convertible and came out above the window on the driver's side at a downward angle of 17 degrees, as if fired by someone reaching over the car's roof; a bloody handprint on the driver's door of the defendant's car was that of the victim; the keys to the victim's car were found by his body in the street; and the pistol, although dusted for fingerprints, produced no prints which were of a quality which could be compared.

In contending the evidence is insufficient to sustain his conviction, defendant relies upon the testimony of his witness, Carter, and alleged

shortcomings in the testimony of Florez and Harris. Sherry Young admittedly fled with the first shots and did not witness the fatal shot.

Carter, who had known the defendant for nine years, testified that he was on the northeast corner of Seventh and Willow Streets, a point otherwise fixed at about 14 yards south of where the victim's Ford was parked on the east side of Willow Street. He observed an altercation between Welch and Ms. Young on Willow Street in which Welch knocked the woman down and tried to get something from her. Both Ms. Young and Florez testified that the woman had jumped out and started hitting Welch with a broom handle as the two men were returning to Welch's car, and that Welch merely retreated and never struck her. Harris testified that: he was sitting in the driver's seat of defendant's Cadillac convertible, which was parked on the west side of Willow Street across from Welch's car; defendant was in the front passenger seat and Ms. Johnson was in the back seat behind the driver, when he first observed Ms. Young attacking one of the two men across the street with a broomstick.

Carter placed Harris in the front passenger's seat and the defendant in the driver's seat of the Cadillac. He stated, as did Harris, that as Ms. Young began her attack, the defendant left his car and talked to two occupants of another car, which Carter located in a neighboring service station. Meanwhile, according to Florez, Welch unlocked the curbside door of the Ford, and as Florez entered, Welch went around to the door on the driver's side with keys in hand. Both Florez and Ms. Young placed her behind the car at this stage of the proceedings. Harris testified that the defendant returned to his automobile and asked for his "piece," a .25 caliber automatic, and that he, Harris, secured it from the armrest of the car and gave it to the defendant, who returned to the car where he had been conversing. Then, as testified to by all four witnesses, defendant started across the street approaching Welch and Ms. Young.

According to Carter, the defendant asked Welch what was the matter. Welch replied that it was none of his business, but defendant insisted it was. Florez and Harris testified that the defendant as he approached offered his gun to Ms. Young. She testified that Welch said that she could hit him but that defendant could not. Florez confirmed that the victim told defendant it was none of his buiness. All witnesses agreed that the men moved closer and further words were exchanged. Ms. Young testified Welch looked as if he wanted to form a fist, but she did not see anything else in his hands. According to Harris, Welch told the defendant "You have it, why don't you use it?" According to Carter, Welch pushed defendant, although the other witnesses did not put the altercants that close together. All agree that at about this point defendant fired his gun into the

ground one or more times—Florez: "at least four times"; Ms. Young: saw something in defendant's hand, but could not be sure it was a gun, heard a shot from where defendant was standing, fled, and heard more shots as she was running down Seventh Street; Harris: two shots into the ground; and Carter: once or twice into the street at defendant's feet.

Carter testified that Welch cursed and advanced on the defendant, who backed up to within five feet of the driver's side of his car with his gun at his side. Florez stated that: after the shots were fired he did not immediately notice where the defendant went, but he saw Welch moving toward the Cadillac; he got out of the Ford and stood by the rear of the car; he saw a gun go over the top of the car from the passenger's side and fire, and also saw a hand go over the top of the car but could not definitely say that he saw a gun in that hand; the man who had been in the street with Welch was then on the passenger side of the Cadillac; and the man who had been in the street and had gone to the passenger side of the car, jumped in that side and the car drove off. Harris testified he was still in the driver's seat of the car; that as defendant backed up toward the Cadillac and Welch advanced, Welch had his hands clenched together and it looked as if he had something in his right hand; that defendant told Welch "get off the street" and that defendant may have fired another shot at that time. Harris stated that: the defendant moved to the rear of the car out of the witness' sight; Welch moved toward the driver's door, and the defendant reappeared on the passenger side of the vehicle; he heard a thump on the window of the car and something that sounded like a gunshot; the defendant got in the front passenger side of the vehicle with his gun in his left hand and told Harris to drive off; police pursuit commenced on Seventh Street; while driving something was thrown from the passenger side of the automobile; after reaching the freeway defendant told Harris that all the guns were out of the car; and then Harris pulled the car over and he and defendant were arrested.

According to Carter, at the time the fatal shot was fired, Harris had partially opened the door on the passenger's side of the Cadillac, and placed one foot on the ground and one in the car, as he looked over the top of the car with at least one arm resting on the top; defendant had remained standing by the driver's side with his gun pointed at the ground. Carter testified that he heard what he deemed the third shot fired, but he could not tell by whom, as there were 15 to 20 people in the area; and that Welch, who had been standing directly in front of the defendant at the driver's side of the Cadillac, staggered and fell to the ground.

Defendant's argument is predicated upon the proposition that there was

no direct evidence that the defendant fired the fatal shot over the top of the car. He points to the following weaknesses in the testimony of Florez: Florez admitted he had 12 beers. Presumably he was under the influence of intoxicating liquor to the same extent as his companion, the victim; he admittedly could not see the man he referred to in his testimony well enough to identify him; in the description given to the police he stated the assailant was a Negro, rather than, as is the fact, a Mexican-American; his powers of observation were curtailed by the fact that he was engaged in getting out of the victim's car at a crucial stage of the proceedings; he was unable to identify the defendant as the man he saw at either a lineup or in open court, and in fact he testified that he had never seen the defendant before the day of the trial; and although he testified that he later saw the same man who had been in the street, on the passenger side of the Cadillac, he could not swear that that man was the person who fired the shot.

Harris' testimony is dismissed as the product of his attempt to avoid responsibility and of his plea and the favorable disposition made of the charge against him. He did not testify that defendant in fact fired the fatal shot. His testimony that the defendant was at one time standing at the passenger side of the vehicle is explained as a partial truth, warranted by the fact that defendant after the shooting admittedly entered the passenger side, and must have come there for that purpose. Defendant points out that Harris as a Negro fitted the description of the man observed by Florez.

Carter's testimony that Harris was standing at the place from whence the fatal shot emanated is elevated to the only true version, because of his long time acquaintance with both Harris and the defendant.

Defendant's syllogism proceeds as follows: "(1) the only evidence against Cisneros in this regard, the testimony of Florez and Harris, is circumstantial; (2) in addition to being circumstantial this evidence is weak because neither of them was in a position to see the complete sequence of events without interruption; (3) furthermore, since this evidence is susceptible to a reasonable interpretation consistent with the innocence of Cisneros—that Harris fired the fatal shot—this interpretation must be adopted; and (4) such a conclusion is consistent with, and, indeed, required by, the only direct evidence on the issue, the testimony of Carter, the one witness with a clear vantage point."

This analysis overlooks the following facts: defendant admittedly was the man who engaged in the altercation with the victim in the street between the two cars; Florez' description of that man was in all respects, except race, consistent with defendant's description, including the color

of the clothes he wore, and, in that respect, was inconsistent with the color of the apparel worn by Harris; that although Harris' testimony was suspect because of a desire to escape responsibility, it would have been impossible for him to fire the fatal shot unless he secured from defendant the gun with which the warning shots had been fired in the street; that if Harris had secured that gun and fired the fatal shot, the defendant, as Carter testified, could not have been holding that gun pointed at the ground at the driver's side of the vehicle, at the time the fatal shot was fired from the passenger's side; and finally there was no motive for Harris, as distinguished from defendant, to fire the fatal shot.

Over 80 years ago the Supreme Court of this state stated, "The issues determined by the court below depended almost entirely upon the weight to be given to contradictory and conflicting evidence, and the counsel for the respective parties have presented to this court elaborate briefs, in which that evidence is reviewed, and wherein we are asked to weigh the same, and determine the conflict between the testimony of the plaintiffs and of the defendant, and the corroboration given to either. It would seem hardly necessary, at this day, to repeat the oft-asserted rule that the determination of the trial court upon such evidence is conclusive in this court, and that after that court, upon a motion for a new trial, has affirmed its former decision, it is a needless consumption of time and labor, as well of counsel as of the members of this court, to attempt here a review of the correctness of such determination, or to ask of us to determine the relative weight to be given to the respective statements of the witnesses." (*Dobinson* v. *McDonald* (1891) 92 Cal. 33, 36 [27 P. 1098]. See also *People* v. *Crowe* (1973) 8 Cal.3d 815, 833-834 [106 Cal.Rptr. 369, 506 P.2d 193]; *People* v. *Mosher* (1969) 1 Cal.3d 379, 395 [82 Cal.Rptr. 379, 461 P.2d 659]; and *People* v. *Hillery* (1965) 62 Cal.2d 692, 702-703 [44 Cal.Rptr. 30, 401 P.2d 382] [cert. den. (1967) 386 U.S. 938 (17 L.Ed.2d 810, 87 S.Ct. 958)]. Cf. *People* v. *Kunkin* (1973) 9 Cal.3d 245, 250 [107 Cal.Rptr. 184, 507 P.2d 1392]; and *People* v. *Redmond* (1969) 71 Cal.2d 745, 755-756 [79 Cal.Rptr. 529, 457 P.2d 321].)

### III

Defendant contends that the trial court committed prejudicial error, because the evidence supported findings that Ms. Young and Harris were accomplices of the defendant, and no instructions were given defining what an accomplice is (see CALJIC (3d ed. 1970) No. 3.10; cf. *id.* (rev. ed. 1958) in effect at time of trial, September 1969, No. 821 (rev.)), the necessity for corroboration of an accomplice's testimony (*id.*, Nos. 3.11 and 821 (rev.) respectively), defining corroborative and independent evi-

dence (*id.,* Nos. 3.12 and 822 (rev.) respectively), nor that the jurors should view an accomplice's testimony with distrust (*id.,* Nos. 3.18 and 829 respectively).

Penal Code section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

■ The following principles apply to a claim that instructions must be given on the subject of an accomplice's testimony: "Whether a witness for the prosecution is or is not an accomplice may be a question of law or fact. Where the facts with respect to the participation of a witness in the crime for which the accused is on trial are clear and not disputed, it is for the court to determine whether he is an accomplice; but where, although there is evidence tending to connect the witness with the crime, the facts are disputed or susceptible of different inferences, the question of complicity should be submitted to the jury. [Citations.] ■ Where such witness is an accomplice as a matter of law, the court should so charge, and an instruction defining an accomplice is not necessary. ■ Conversely, where, as a matter of law, the witness is not an accomplice, the court does not err in refusing to charge that he is or in refusing to submit the issue to the jury. But where it is for the jury to determine whether or not the witness is an accomplice, the court should so charge, and should instruct as to what constitutes an accomplice. [Citations.]" (*People* v. *Jones* (1964) 228 Cal.App.2d 74, 94-95 [39 Cal.Rptr. 302]. See also *People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103] [cert. dism. (1961) 366 U.S. 417 (6 L.Ed.2d 380, 81 S.Ct. 1355)]; *People* v. *Collum* (1898) 122 Cal. 186-187 [54 P. 589]; *People* v. *Johnson* (1971) 18 Cal.App.3d 458, 463-464 [95 Cal.Rptr. 316, 96 Cal.Rptr. 695]; *People* v. *Gonzales* (1970) 4 Cal.App.3d 593, 607 [84 Cal.Rptr. 863]; *People* v. *Crary* (1968) 265 Cal.App.2d 534, 540-541 [71 Cal.Rptr. 457]; *People* v. *Williams* (1968) 260 Cal.App.2d 868, 873 [67 Cal.Rptr. 442]; *People* v. *Wolden* (1967) 255 Cal.App.2d 798, 803-804 [63 Cal.Rptr. 467] [cert. den. (1968) 391 U.S. 965 (20 L.Ed.2d 877, 88 S.Ct. 232)]; *People* v. *McCleary* (1962) 205 Cal.App.2d 432, 435-436 [23 Cal.Rptr. 173] [cert. den. (1963) 373 U.S. 940 (10 L.Ed.2d 695, 83 S.Ct. 1546)]; and *People* v. *Moore* (1953) 120 Cal.App.2d 303, 306-307 [260 P.2d 1011] [cert. den. (1954) 347 U.S. 978 (98 L.Ed. 1117, 74 S.Ct. 791)].)

Such instructions must be given when warranted by the evidence, even though no request for them is made by the defendant. (*People* v. *Warren* (1940) 16 Cal.2d 103, 114-119 [104 P.2d 1024]; *People* v. *Cooper* (1970) 10 Cal.App.3d 96, 102 [88 Cal.Rptr. 919]; *People* v. *Crary, supra*, 265 Cal.App.2d 534, 541; *People* v. *Wade* (1959) 169 Cal.App.2d 554, 557 [337 P.2d 502]; *People* v. *Catlin* (1959) 169 Cal.App.2d 247, 254 [337 P.2d 113].) ■ ". . . [B]y definition an accomplice must voluntarily, with guilty knowledge and common intent with the principal offender, unite in the commission of the crime." (*People* v. *Williams, supra*, 260 Cal.App.2d 868, 873. See also *People* v. *Duncan, supra*, 53 Cal.2d 803, 816; and *People* v. *Jones, supra*, 228 Cal.App.2d 74, 94.) ■ "One who is a party to a conspiracy and active in carrying out its object is an accomplice. [Citations.]" (*People* v. *Jones, supra*, 228 Cal.App.2d 74, 94.) A person likewise may be liable to prosecution for the same offense as another, and therefore be the latter's accomplice, if he actually participates in the crime or aids or abets the actual perpetrator. To aid and abet means "to instigate, encourage, promote, or aid with guilty knowledge of the wrongful purpose of the perpetrator. [Citation.]" (*People* v. *McCleary, supra*, 205 Cal.App.2d 432, 435.)

Defendant particularly relies upon the following principle first quoted in *People* v. *Moore, supra*, as follows: " 'Where two or more persons enter upon a common undertaking, whether by prearrangement, or entered into on the spur of the moment, and that undertaking contemplates the commission of a criminal offense, each of the parties to the undertaking is equally guilty of the offense committed whether he did an overt act or not.' [Citation.]" (120 Cal.App.2d at pp. 306-307. See also *People* v. *Gonzales, supra*, 4 Cal.App.3d 593, 600.)

■ In urging that Ms. Young was an accomplice, defendant points to the fact that she had attacked the same victim with a broom handle and beat him so badly as to cut up his face. There is no evidence to show that she ever knew, much less acted in concert with, the defendant. The fact that she refused the defendant's offer of a weapon contradicts any intent to commit grievous bodily injury on the victim. Although she was present when the defendant fired the first shot, she fled before the later fatal shot was fired. Refusal to participate in a crime does not make one an accomplice. (See *People* v. *Crary, supra*, 265 Cal.App.2d 534, 541.) There is absolutely no evidence at all from which she could be found to be liable to prosecution for the offense of the murder of the victim.

■ In the case of Harris, defendant refers to the fact that Harris admittedly gave defendant the automatic pistol from out of the car when

requested to do so, drove away from the scene of the homicide at a rapid rate at the defendant's bidding, and in fact plead guilty to being an accessory after the fact. Defendant suggests that Harris and the defendant "entered a common undertaking on the spur of the moment—to scare off the white man who was hassling the woman—each of them to play their [*sic*] own part in the enterprise."

There are several reasons why the foregoing acts did not rise to the dignity of subjecting Harris to prosecution for the identical offense with which the defendant is charged, that is, the murder of Welch by a bullet fired by the defendant. There is no evidence which indicates that Harris had any idea of the purpose for which defendant wanted his gun. Defendant had been talking with others, and it was only after he received the weapon, and possibly after he had received the weapon and returned to the company of others, that defendant approached Welch and began the altercation which terminated in the latter's death.

Penal Code section 32 provides in pertinent part, "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony . . . is an accessory to such felony." Section 971 provides in pertinent part, "The distinction between an accessory before the fact and a principal, and between principals in the first and second degree is abrogated; and all persons concerned in the commission of a crime, who by the operation of other provisions of this code are principals therein, shall hereafter be prosecuted, tried and punished as principals. . . ." It is clear that there is a distinction between being an accessory after the fact and a principal who is liable to prosecution for the identical offense charged against the defendant whom the former may harbor, conceal or aid. (See *People* v. *Collum, supra,* 122 Cal. 186, 187; and *People* v. *Wolden, supra,* 255 Cal.App.2d 798, 803-804.) Therefore neither Harris' act in aiding the defendant after he committed the crime, nor Harris' plea of guilty to the charge to which that act gave rise, furnishes the basis for a finding that he was an accomplice.

The combination of the furnishing of the gun and the driving away, in the absence of further evidence showing an intent to enter into a common undertaking to shoot Welch, is also insufficient to create the liability for prosecution necessary to make Harris an accomplice. In short there were no facts sufficient to take the accomplice issue to the jury.

It should be further noted that if the jury believed the testimony of Carter to the effect that Harris was the only one in a position to fire the

fatal shot, then Harris would be liable for prosecution for murder, not as an accomplice, but as the principal perpetrator. Those facts not only would fail to give rise to instructions on accomplice testimony in the prosecution of the defendant, but also would produce serious error in that if the jurors believed that Harris fired the fatal shot, under the accomplice instructions they still might believe that the defendant should be held guilty as charged because he was an accomplice of Harris. (Cf. *People* v. *Terry* (1970) 2 Cal.3d 362, 398-399 [85 Cal.Rptr. 409, 466 P.2d 961] [cert. den. (1972) 406 U.S. 912 (32 L.Ed.2d 112, 92 S.Ct. 1619)]; *People* v. *Sawyer* (1967) 256 Cal.App.2d 66, 73-74 [63 Cal.Rptr. 749]; *People* v. *Catlin, supra,* 169 Cal.App.2d 247, 254-255; and *People* v. *Arends* (1957) 155 Cal.App.2d 496, 513 [318 P.2d 532].)

Even if it be deemed that the court erred in failing to give a conditional instruction on the effect of an accomplice's testimony, it is not every case in which the error requires a reversal. If it is not reasonably probable that a result more favorable to the defendant would have been reached had the instruction been given, there has been no miscarriage of justice. (Cal. Const., art. VI, § 13; *People* v. *Cooper, supra,* 10 Cal.App.3d 96, 103; *People* v. *Wade, supra,* 169 Cal.App.2d 554, 557; and *People* v. *Catlin, supra,* 169 Cal.App.2d 247, 255.) In *People* v. *Warren, supra,* the only testimony to implicate the defendant was that of the possible accomplice (see 16 Cal.2d at p. 119). Here on the other hand the record reveals ample evidence corroborating the testimony of Harris, and which of itself furnished evidence of defendant's guilt.

No prejudicial error is found in the failure to give the instructions with respect to the testimony of an accomplice.

## IV

In *People* v. *Burns* (1948) 88 Cal.App.2d 867 [200 P.2d 134], the court laid down the following rule concerning the trial court's duty to instruct: "It is elementary that the court should instruct the jury upon every material question upon which there is any evidence deserving of any consideration whatever. [Citations.] The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon. [Citations.] That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true. [Citations.]" (88 Cal.App.2d at p. 871.) This rule was approved in *People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281], and has been uniformly followed. (See *People* v. *Tidwell* (1970) 3 Cal.3d 82, 86

[89 Cal.Rptr. 58, 473 P.2d 762]; *People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390]; *People* v. *Wilson* (1967) 66 Cal.2d 749, 762-763 [59 Cal.Rptr. 156, 427 P.2d 820]; and *People* v. *Mayweather* (1968) 259 Cal.App.2d 752, 753 [66 Cal.Rptr. 547]. Cf. *People* v. *Wade* (1959) 53 Cal.2d 322, 333-335 [1 Cal.Rptr. 683, 348 P.2d 116]; *People* v. *Holt* (1944) 25 Cal.2d 59, 64-67 [153 P.2d 21]; and *People* v. *Cram* (1970) 12 Cal.App.3d 37, 41 [90 Cal.Rptr. 393].)

Penal Code section 26 provides, "All persons are capable of committing crimes except those belonging to the following classes: . . . Four—Persons who committed the act or made the omission charged under an ignorance or mistake of fact, which disproves any criminal intent." (See also CALJIC (3d ed. 1970) No. 4.35; cf. *id.* (rev. ed. 1958) No. 71-E (rev.).) Insofar as self-defense is concerned, it has been said, "If defendant acted from reasonable and honest convictions he cannot be held criminally responsible for a mistake in the actual extent of the danger, when other reasonable men would alike have been mistaken. [Citation.]" (*People* v. *Dawson* (1948) 88 Cal.App.2d 85, 96 [198 P.2d 338]. See also *People* v. *Hernandez* (1964) 61 Cal.2d 529, 532-536 [39 Cal.Rptr. 361, 393 P.2d 673, 8 A.L.R.3d 1092]; and *People* v. *Vogel* (1956) 46 Cal.2d 798, 801-805 [299 P.2d 850].)

(10) In reliance upon testimony which indicated that Welch spoke to the defendant in profane, provocative language, pushed defendant backwards, balled his hands into fists, and was carrying car keys, defendant contends it was incumbent on the court to instruct the jury that the defense of self-defense was available to the defendant if he mistakenly perceived that Welch was carrying a knife or a handgun. Since the jury was otherwise instructed on self-defense,[1] his contention must go to the question of

---

[1]These instructions read in pertinent part: "It is lawful for a person who is being assaulted and who has reasonable ground for believing that bodily injury is about to be inflicted upon him, to stand his ground and defend himself from such attack, and in doing so he may use all force and means *which he believes to be reasonably necessary and which would appear to a reasonable person in the same or similar circumstances to be necessary to* prevent the injury which appears to be imminent. A person who has been attacked and who is exercising his right of lawful self-defense is not required to retreat and he not only may stand his ground and defend himself against the attack but may also pursue his assailant until he has secured himself from danger, *if that course appears to him and would appear to a reasonable person in the same situation to be reasonably and apparently necessary,* and this is his right, even though he might more easily have gained safety by withdrawing from the scene.

". . . [self-defense by an aggressor] . . . .

"The kind and degree of force which a person may lawfully use in self-defense are limited by what *a reasonable person in the same situation as such person, seeing what he sees and knowing what he knows, then would believe to be necessary.* Any use of

the degree of force which the defendant would be justified in using in the exercise of that privilege.

The conclusion which defendant now seeks to draw from the evidence is not one which would be readily apparent to the trial court. In acting in self-defense the person assailed is not entitled to act upon a subjective standard; "the circumstances must be sufficient to excite the fears of a reasonable person." (Pen. Code, § 198.) There is no evidence which would have indicated to the trial court that the keys which the victim had in his hand after he unlocked the passenger side door of his car for Florez, before the altercation, and which were found by his body after he was shot, were ever observable in the intervening period. Carter made no mention of anything in Welch's hands; Ms. Young never observed anything in his hands; and Harris testified that Welch's hands were clenched and "it looked like he had something in . . . his right hand." He did not know what it was, and apparently assumed Welch was clenching something which he could not see extending from Welch's hands. In the absence of any evidence of a viewable object which a reasonable man would have taken for a knife or a gun it is pure speculation to assume that the defendant could reasonably believe that Welch was carrying such a weapon.

Even if the inference now advanced by appellant could be raised from the evidence, it is a specific point developed at the trial which made it necessary for defendant to request an instruction. In *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370] the court stated "The general rule is that the trial court must instruct the jury on the general principles of law relevant to the issues raised by the evidence, even though not requested to do so, but need not instruct on its own motion on

---

force beyond that is regarded by the law as excessive. Although a person may believe that he is acting and may act in self-defense, he is not justified in using a degree of force clearly in excess of that *apparently and reasonably* necessary under the existing facts and circumstances.

"A person who defends himself against unlawful attack must stop the use of force as soon as danger of attack has ended. If it would appear to a reasonable man in the same position that there is no further danger, then there should be no further force.

"If an assault with the fists is being made upon a person but without intent to kill or do great bodily harm, and if the assault is not likely to produce great bodily injury, and if the one thus attacked is not deceived as to the character of such an assault, he is not justified in using a deadly weapon in self-defense. Where an assault is made with only the hands and fists but with such force and in such manner as is likely to produce great bodily injury, the person attacked may lawfully resist the attack with whatever force is *reasonably* and *apparently* necessary." (Italics added.) (See CALJIC (rev. ed. 1958) Nos. 621 [cf. (3d ed. 1970) No. 5.30]; 622 [cf. *id.*, No. 5.50]; 623 [cf. *id.*, No. 5.54]; 625 [cf. *id.*, No. 5.30]; 625-A (rev.) [cf. *id.*, No. 5.52]; 626 and 626-A [cf. *id.*, No. 5.31]. Cf. Nos. 321-A, 321-B and 322-329 inclusive [*id.*, Nos. 5.10, 5.11, 5.12 and 5.14].)

specific points developed at the trial." (1 Cal.3d at p. 449. See Pen. Code, § 1093, subd. 6, and § 1127.) "Omniscience is not required of our trial courts." (*People* v. *Wade, supra,* 53 Cal.2d 322, 335; and see *People* v. *Cram, supra,* 12 Cal.App.3d 37, 41.) In this connection it should be borne in mind that the defendant's principal contention, in reliance upon the testimony of Carter, was that a third person, presumably Harris, fired the fatal shot while the defendant was standing peacefully by the driver's side of the car. After the jurors had deliberated about three hours they returned to court after requesting instructions on "Influence of the heat of passion . . . also first degree murder." The court then, on its own motion, reread all the instructions it had given on murder and manslaughter. The judge then inquired, "Did the jury have any question on the law as to self-defense?" and received a negative reply from the foreman. The following afternoon, the jury having retired for the night without a verdict, the consensus of the jury was that those instructions read before should be reread, and at counsel's request all were given again. On concluding the court asked defense counsel if he had a further request, and received a negative answer. From the foregoing it appears that the jury's deliberations from the start focused on the events which transpired after the original contact between Welch and defendant, and self-defense, or the defense of Ms. Young (see part V, below) was not an issue.

It is also apparent that the general instructions given by the court (see fn. 1 as emphasized, above) contained within them provisions which permitted the defendant to argue to the jury the possibility that a reasonable person might have entertained such belief that Welch was armed.

No error is found in the failure of the court to give a specific instruction on the question of mistake of fact.

## V

In reliance upon principles reviewed above (part IV, *supra*), defendant insists that the trial court committed reversible error in failing to instruct the jury with respect to the defense of others. Section 197 of the Penal Code provides, "Homicide is also justifiable when committed by any person in any of the following cases: 1. When resisting any attempt . . . to do some great bodily injury upon *any* person; . . ." (Italics added. See also CALJIC (rev. ed. 1958) Nos. 321 and 321-B. Cf. *id.* (3d ed. 1970) Nos. 5.10 and 5.32.) He contends that: the evidence indicates he had an opportunity to observe the altercation between Welch and Ms. Young; he could have seen Welch knock her down (if Carter's testimony that he did so were believed); he walked from the service station, where he had gone to talk to some other people, into the street to intervene on

her behalf; and his defense of Ms. Young escalated because of Welch's aggressiveness to the point where it was necessary to take the latter's life.

This approach does not bear analysis. It may be assumed that the jury could disbelieve Ms. Young and Florez, and find, as indicated by Carter's testimony, that Welch was the aggressor in what Carter termed the hassle between Welch and Ms. Young, and that it appeared that at that time Welch might inflict great bodily injury upon her. It is clear, however, that if such were the case, the actions which the defendant *might* have observed occurred while defendant was in the service station talking with others. Both Carter and Harris placed him there, and there is no evidence to the contrary. The uncontradicted evidence reflects that by the time the defendant confronted Welch in the street there was no threat of any bodily harm to Ms. Young. Not only did Ms. Young herself and Florez and Harris so testify, but also Carter testified that after the original encounter, "Well, it seemed like, ya know, she [Ms. Young] walked away from him [Welch]." He testified with respect to Welch, "Then he came out. He kind of like, the young lady was saying something to him and he was backing out. He came out on the street." It was at this point that the defendant came over. On cross-examination Carter reiterated that the physical struggle in which Welch "slung her down," all took place "Right on the corner." He added that when Ms. Young was down, "He [Welch] backed away and she got up," and he confirmed that there was no subsequent physical contact between the two of them.

In short there is no evidence to show that the defendant was other than a gratuitous intermeddler in an altercation which had already ended, or an avenging angel for some wrong he might possibly have envisioned. Under those circumstances it would have been improper to give the instructions which defendant now contends should have been given. (See *People v. Cantrell* (1973) 8 Cal.3d 672, 685 [105 Cal.Rptr. 792, 504 P.2d 1256]; and *People* v. *Nichols* (1970) 3 Cal.3d 150, 165 [89 Cal.Rptr. 721, 474 P.2d 673] [cert. den. (1971) 402 U.S. 910 (28 L.Ed.2d 652, 91 S.Ct. 1388)].) At best the situation is one where the defendant should have requested the instruction. As stated in *People* v. *Cram, supra,* "There is no duty on the trial court to dissect the evidence in an effort to develop some arcane, remote or nebulous theory of the evidence on which to instruct. The duty of the trial court involves percipience—not omniscience. [Citations.]" (12 Cal.App.3d at p. 41.)

## VI

Defendant's companion, Harris, who testified for the prosecution, stated on cross-examination that he met the defendant about 10 or 11 o'clock

in the morning of the day preceding the early morning homicide; they started drinking mixed drinks—Singapore Slings, Tom Collins and some brandy—about noon; and they were drinking the majority of that day, and had their last drink before 1 a.m. The officer first upon the scene testified that he heard the shots at 3:31 a.m. The arresting officer testified that when he observed the defendant, after stopping the car on the freeway, the defendant's speech was very clear, there was no discernible odor of alcohol on his breath when he was talking, he walked fine, and there were no observable effects to indicate that the defendant was under the influence of alcohol. He therefore concluded that defendant was not under the influence of alcohol.

The court instructed the jury from the extant instructions as found in CALJIC (rev. ed. 1958) with revisions to October 8, 1969. After defining homicide (instruction No. 300 (new) [cf. 3d ed. 1970, No. 8.00]), the court continued, to define the following: murder and malice (instruction No. 301 (rev.) [cf. *id.*, Nos. 8.10 and 8.11]), the classification of murder (instruction No. 302 [*id.*, No. 8.70]), the distinction between first and second degree murder (instruction No. 302-A, modified to delete references to specific felonies), premeditated murder of the first degree (instruction No. 303 (rev.) [cf. *id.*, No. 8.20]), deliberate and premeditated (non-published), the effect of diminished capacity to premeditate (instruction No. 303-A (new) [cf. *id.*, No. 8.77]),[2] murder of the second degree (instruction No. 305, rerevised December 27, 1968 [*id.*, No. 8.30]), the effect of diminished capacity to premeditate, deliberate, or harbor malice (instruction No. 305.1 (new) [cf. *id.*, No. 8.77]),[3] the duty of jurors when reasonable doubt as to degree of murder (instruction No. 305-A [cf. *id.*, No. 8.71]), the duty

---

[2]This instruction read: "Before you may find the defendant guilty of willful, deliberate and premeditated murder of the first degree, you must determine that at the time the crime allegedly was committed he not only had sufficient mental capacity to form the specific intent to kill but also had sufficient mental capacity to maturely and meaningfully deliberate, premeditate and reflect upon the gravity of his contemplated act and to harbor malice aforethought."

[3]This instruction read: "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate or form an intent to kill, you cannot convict him of a willful, deliberate and premeditated murder of the first degree.

"Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of either the first or second degree."

of jurors when reasonable doubt as to whether murder or manslaughter (instruction No. 305-AA (new) [*id.*, No. 8.72]), the necessity for unanimity as to the degree (instruction No. 305-B (rev.) [cf. *id.*, No. 8.74]), manslaughter (instruction No. 308 (rev.) [*id.*, No. 8.37]), voluntary manslaughter (instruction No. 308-A (rev.) [cf. *id.*, No. 8.40]), involuntary manslaughter (instruction No. 308-B (rev.) [cf. *id.*, No. 8.45 (1972 revision)]), due caution and circumspection (instruction No. 309 (rev.) [*id.*, No. 8.46]), the distinction between murder and manslaughter (instruction No. 310 (rev.) [cf. *id.*, No. 8.51]), passion (unpublished), heat of passion (instruction No. 311 Alternate, modified by changing "will reduce" to "classifies" [cf. *id.*, No. 8.43]), when evidence of provocation may be considered in determining degree of murder (instruction No. 311-B, modified by changing "reduce" to "classify" [cf. *id.*, No. 8.73]), cooling period (instruction No. 311-C, modified by changing "reduce" to "classify" (cf. *id.*, No. 8.52]), and the effect of intoxication on a homicide (instruction No. 319 (rev.), first two paragraphs [cf. *id.*, No. 4.21]).[4]

The foregoing instructions were twice repeated: once, when the jury, after deliberating for almost three hours, requested restatement of the court's instructions on "influence of heat of passion" and on "first degree murder"; and again, on the following afternoon, after the jury had deliberated for an additional seven and three-quarters hours, when the consensus of the jury was that there should be a further repetition. A verdict was returned 77 minutes later.

---

[4]This instruction read: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive or intent with which he committed the act. If and when the proof shows that the defendant unlawfully killed a human being, and if the evidence shows that at the time of the mortal assault the defendant was intoxicated, the jury is permitted and ought to consider such evidence of intoxication with the purpose of determining the intent with which the act was done."

This instruction conflicted in part with an earlier instruction which read: "The specific intent with which an act is done may be manifested by the circumstances surrounding its commission, but you may not find the defendant guilty of the offense charged unless the proved circumstances not only are consistent with the hypothesis that he had the specific intent required for said crime, as set forth in my instructions, but are irreconcilable with any other rational conclusion.

"The intent with which an act is done is manifested by the circumstances attending the act, the manner in which it is done, the means used and the sound mind and discretion of a person committing the act.

"All persons are of sound mind who are neither idiots nor lunatics nor affected by insanity. For the purposes of the issues now on trial, you must assume that the defendant was sane at the time of his alleged conduct, which it is charged constitutes the crime described in the information." (See CALJIC (rev. ed. 1958) No. 73 as revised, and No. 27. Cf. (3d ed. 1970) No. 3.34.)

Defendant contends that the trial court committed reversible error in failing to specifically instruct the jury that diminished capacity could eliminate the specific intent necessary for conviction of voluntary manslaughter, and in failing to relate its instructions on voluntary and involuntary manslaughter to the defense of diminished capacity. By definition voluntary manslaughter encompasses an intent to kill a human being. (Pen. Code, § 192, subd. 1; and see *People* v. *Gorshen* (1959) 51 Cal.2d 716, 732-733 [336 P.2d 492].) The gravity of the homicide is reduced because "a sudden quarrel or heat of passion" frees the perpetrator of the malice requisite for first or second degree murder, but it does not free the prosecution from establishing the intent to kill. This intent to kill, as well as the malice necessary for murder, may be lacking if the perpetrator of the homicide lacked the capacity to form the necessary mental state. In *People* v. *Mosher* (1969) 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659], the court stated that where the evidence supports instructions on diminished capacity the court must also instruct "that if, due to diminished capacity the defendant had neither malice nor intent to kill, the offense could be no greater than involuntary manslaughter." (1 Cal.3d at p. 391.) On the other hand, instruction No. 8.48 has been criticized and revised (1971 revision) because it permitted a reduction from voluntary to involuntary manslaughter because of a diminished capacity to form the intent to kill occasioned by voluntary intoxication, whereas the law only reduces the offense if the voluntary intoxication was such as to produce unconsciousness. (See *People* v. *Roy* (1971) 18 Cal.App.3d 537, 545-550 [95 Cal.Rptr. 884] [cert. den. (1972) 405 U.S. 976 (31 L.Ed.2d 251, 92 S.Ct. 1202)].) There being no claim of, or evidence of unconsciousness in this case, there could be no error in refusing to instruct on nonstatutory involuntary manslaughter as induced by voluntary intoxication. *(Id.)*

The foregoing point, and, as well, defendant's further contention that the court committed reversible error in failing to relate its instructions on both voluntary and involuntary manslaughter to the defense of diminished capacity, are both embraced in the general principle that when there is evidence of diminished capacity it is not sufficient to merely qualify the instructions on murder, but it is also necessary to give an instruction on the nonstatutory manslaughter which may result. In *People* v. *Tidwell* (1970) 3 Cal.3d 82 [89 Cal.Rptr. 58, 473 P.2d 762] the opinion notes that the trial court had instructed and had failed to instruct in a manner parallel to that in this case, and concluded that the failure to instruct on voluntary and involuntary manslaughter in the light of diminished capacity was error. It stated, "The trial court properly instructed the jury that diminished capacity may prevent one from forming any of the specific

mental states which are essential elements of murder, and may prevent premeditation, malice, willfulness, or deliberation which are necessary to a finding of murder in the first degree. [¶] The trial court also instructed the jury on the elements of first and second degree murder in accordance with Penal Code sections 187-189, and informed the jury that it could not find defendant guilty of murder in the first or second degree if it determined that the element of malice was rebutted by evidence of defendant's diminished capacity. [¶] However, the court failed to instruct the jury regarding voluntary manslaughter, thereby excluding the jury from considering manslaughter as the offense for which it should find defendant guilty if it determined that malice was rebutted by evidence of defendant's intoxication. The court's omission was error (*People* v. *Castillo,* 70 Cal.2d 264, 269-271 . . .; *People* v. *Conley,* 64 Cal.2d 310 . . .), and the error was prejudicial per se since defendant was thereby denied a jury trial on all of the issues presented by the evidence (*People* v. *Mosher,* 1 Cal.3d 379, 390 . . .; *People* v. *Modesto, supra,* 59 Cal.2d 722, 730-731 [31 Cal.Rptr. 225, 382 P.2d 33]). [¶] The trial court also erred in failing to instruct the jury on the aspects of involuntary manslaughter in the context of a diminished capacity defense. . . . [¶] If, upon retrial, there is evidence which indicates that defendant was unconscious at the time of the offenses due to voluntary intoxication, the trial court should instruct on involuntary manslaughter as specified in *People* v. *Graham, supra,* 71 Cal. 2d 303, 317, footnote 4 [78 Cal.Rptr. 217, 455 P.2d 153]. In addition, if there is evidence which indicates that defendant was unconscious for reasons outside his control, the trial court should instruct on unconsciousness. (Pen. Code, § 26, subd. 5; *People* v. *Mosher, supra,* 1 Cal.3d 379, 391; *People* v. *Wilson,* 66 Cal.2d 749, 761 . . . .)" (3 Cal.3d 82, 86. In addition to the cases cited, see *People* v. *Vasquez* (1972) 29 Cal.App.3d 81, 86-89 [105 Cal.Rptr. 181]; *People* v. *Griffin* (1971) 18 Cal.App.3d 864, 866-870 [96 Cal.Rptr. 218]; and *People* v. *Cobas* (1970) 12 Cal.App. 3d 952, 956 [91 Cal.Rptr. 110].)

An examination of the foregoing cases indicates that in each there was believable evidence that the defendant's mental capacity was affected. In the instant case there is no such evidence. The defendant has the burden of going forward with evidence on the issue of diminished capacity. (*People* v. *Harris* (1970) 7 Cal.App.3d 922, 926 [87 Cal.Rptr. 46]; and *People* v. *Ray* (1967) 252 Cal.App.2d 932, 969-970 [61 Cal.Rptr. 1] [cert. den. (1968) 393 U.S. 864 (21 L.Ed.2d 132, 89 S.Ct. 145)].) It may be acknowledged that such burden would be satisfied by evidence brought out in the proof of the prosecution's case which would leave a reasonable doubt as to whether the accused could entertain the requisite mental state. (Cf.

*People* v. *Loggins* (1972) 23 Cal.App.3d 597, 603 [100 Cal.Rptr. 528].) Here, however, the only facts relied upon are those set forth above, which were brought out in the cross-examination of the People's witness. It was not shown that the witness Harris was himself mentally impaired at 3:30 a.m. on March 19, 1969, from the drinks he had consumed in the company of defendant. The defendant himself did not testify that he suffered any lack of mental capacity. His witness Carter did not testify to any observable indicia of intoxication on the part of the defendant. Nor did the defendant produce as a witness his female passenger, or any of the persons with whom he reportedly conversed at the service station, to testify as to his mental state or state of sobriety at the time of the shooting. His proffered defense, through the testimony of Carter, was nonparticipation at the time of the fatal shooting. On this state of the record there was no occasion to give any instruction on the subject of diminished capacity because of the defendant's intoxication. (*People* v. *Nichols, supra,* 3 Cal.3d 150, 165; *People* v. *Fain* (1969) 70 Cal.2d 588, 597-598, 599-600 [75 Cal.Rptr. 633, 451 P.2d 65]; *People* v. *Bandhauer* (1967) 66 Cal.2d 524, 528 [58 Cal.Rptr. 332, 426 P.2d 900] [cert. den. (1967) 389 U.S. 878 (19 L.Ed.2d 167, 88 S.Ct. 178)]; *People* v. *Roy, supra,* 18 Cal.App.3d 537, 544-545; *People* v. *Cram, supra,* 12 Cal.App.3d 37, 41-45; *People* v. *Harris, supra,* 7 Cal.App.3d 922, 925-926; *People* v. *Small* (1970) 7 Cal.App.3d 347, 355-357 [86 Cal.Rptr. 478]; *People* v. *Robinson* (1970) 5 Cal.App.3d 43, 48 [84 Cal.Rptr. 796]; *People* v. *Gonzales* (1970) 4 Cal.App.3d 593, 607-608 [84 Cal.Rptr. 863]; and *People* v. *Crawford* (1968) 259 Cal.App.2d 874, 877-878 [66 Cal.Rptr. 527].) ██ "The mere fact that a defendant may have been drinking prior to the commission of a crime does not establish intoxication or require the giving of a requested instruction thereon. [Citations.]" (*People* v. *Miller* (1962) 57 Cal.2d 821, 830-831 [22 Cal.Rptr. 465, 372 P.2d 297]; and see review of cases in *People* v. *Cram, supra,* 12 Cal.App.3d at pp. 43-45.) ██ On the evidence in this case it would be pure surmise and speculation to conclude that because the defendant had consumed an undetermined number of drinks in a 13-hour period which terminated 2½ hours before the shooting, he was at that time intoxicated in the sense that he lacked sufficient mental capacity to premeditate, or entertain malice, or the specific intent to kill. It would appear therefore that the only error was the error of the court in giving partial instructions on diminished capacity which were more favorable to the defendant than he deserved.[5] Unless these unwarranted

---

[5]It would appear that since these instructions were given (see fns. 2, 3 and 4 above), the jury did in fact have an opportunity to consider whether the defendant had the requisite mental capacity to entertain premeditation, the malice and intent

instructions caused confusion because they were inconsistent or misleading (cf. *People* v. *Cobas, supra,* 12 Cal.App.3d 952, 955-956), there was no miscarriage of justice in failing to give the instructions on nonstatutory manslaughter. (Cal. Const., art. VI, § 13; *People* v. *Watson, supra,* 46 Cal.2d 818, 836.)

Defendant asserts that since the court did in fact instruct upon diminished capacity occasioned by intoxication, the People are foreclosed from asserting that there was no evidence to warrant such instructions. In *People* v. *Castillo* (1969) 70 Cal.2d 264 [74 Cal.Rptr. 385, 449 P.2d 449] the opinion states, "The court must have concluded that sufficient evidence had been adduced to compel an instruction on diminished capacity because it gave such an instruction, although it was an inadequate one." (70 Cal.2d at p. 270. See also *People* v. *Vasquez, supra,* 29 Cal.App.3d at pp. 88-89; *People* v. *Bowen* (1971) 22 Cal.App.3d 267, 293 [99 Cal.Rptr. 498]; and *People* v. *Griffin, supra,* 18 Cal.App.3d at p. 870.) In *Castillo* the court noted, "Defendant introduced expert testimony of two witnesses which tended to show that because of diminished capacity he was unable to premeditate and deliberate or commit the homicide with malice." (70 Cal.2d at p. 267.) In the light of this evidence the court's statement upon which defendant relies cannot be deemed to mean that all inquiry into the propriety of giving of the partial instructions is foreclosed. In *Bowen,* this court merely dismissed an inquiry into the factual justification for giving the instruction, which the defendant contended was erroneously omitted as unnecessary because the court had given other instructions which fully covered the same subject matter. In *Vasquez* the defendant had offered the instructions which the court not only failed but refused to give in the light of testimony from the defendant and his wife to the effect that he was "kind of high" and "kind of loaded" and unable to drive. In *Griffin* the evidence appears to have been "so thin, fragmentary and minimal as to not have required the omitted instructions to have been given upon the court's own initiative." The appellate court, nevertheless, felt bound by *Castillo* to find error because the defendant requested and the court gave,

---

necessary for murder. The jurors' first inquiry indicated that their concern was with statutory manslaughter and murder, and that there was no question concerning the defendant's mental capacity. Even if it be assumed that defendant was entitled to the nonstatutory manslaughter instructions, the fact that the jury found malice, in the face of the instructions which were given, demonstrates that there was no miscarriage of justice on the whole record. (See Cal. Const., art. VI, § 13; and *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] [cert. den. (1957) 355 U.S. 846 (2 L.Ed.2d 55, 78 S.Ct. 70)].) For reasons set forth in this court's opinion in *People* v. *Sedeno* (Cal.App. 1972, vacated by hearing granted by Supreme Court May 31, 1972 [101 Cal.Rptr. 305 at pp. 311-313]), this latter principle may not be relied upon to sustain the judgment.

as in this case, instructions on the effect of diminished capacity on the offense of murder. The court concluded, "It would seem totally illogical to conclude other than that the giving of this instruction demonstrated beyond doubt that the defendant was relying upon the defense of diminished capacity, that the trial judge was alerted to that defense, and that the trial court was of the opinion that there was sufficient evidence of intoxication worthy of consideration by the jury to require all appropriate instructions on diminished capacity to have been given." (18 Cal.App.3d at p. 870.)

It would appear equally illogical to conclude that two wrongs make a right for reversal. If the court through an abundance of caution, or neglect or mistake, gives partial instructions on diminished capacity,[6] whether offered by the defendant or on its own initiative, when no such instructions are warranted, it should not be ruled as a matter of law that all inquiry into the nature of the evidence on the issue is precluded. It is true that the fact that the court was alerted to the defense must be deemed established, but the second premise cannot be elevated to the point that the trial court did not err in concluding that the evidence of intoxication was worthy of consideration. Is the same judge who neglected to fully instruct on diminished capacity so infallible in other respects that he could not err in giving the partial instructions when they were not warranted? The question suggests the answer and the People are entitled to a determination by this court that the evidence of diminished capacity from intoxication was in this case unworthy of consideration. Insofar as *Griffin* appears to foreclose such inquiry, this court cannot follow it.

[6]It should be noted that at the time of the trial in this case the instructions on nonstatutory manslaughter now found in CALJIC (rev. ed. 1970) Nos. 8.41, 8.47, 8.48 and 8.48 (1971 revision) had not been published. In *People* v. *Mosher, supra,* the court indicated, "We find no basis for holding that the failure to give instructions on voluntary and involuntary manslaughter in the context of a diminished capacity defense . . . constituted invited error on the part of the defendant's counsel. In *People* v. *Graham, supra,* 71 Cal.2d 303, 319, we held that 'if defense counsel suggests or accedes to the erroneous instruction because of neglect or mistake we do not find "invited error"; only if counsel expresses a deliberate tactical purpose in suggesting, resisting, or acceding to an instruction, do we deem it to nullify the trial court's obligation to instruct in the cause.' [Citation.] In this case the defense counsel merely acceded to an erroneous instruction because of neglect or mistake. Defense counsel did not express a deliberate tactical purpose in suggesting, resisting, or acceding to the erroneous instruction. [Citation.]" (1 Cal.3d at p. 393.) Nevertheless it is conceivable that counsel may prefer instructions such as were given in this case, because he gets the benefit of a possible factual finding which would preclude a conviction for murder, and can gamble on an acquittal or at worst manslaughter in any event, and, in the light of *Castillo* have a built-in ground for reversal on appeal. *Mosher* and *Graham,* however, preclude any inquiry into whether or not defendant by only offering partial instructions invited the error. (See 1 Cal.3d at p. 393.)

The question remains as to whether the partial instructions were so inconsistent and misleading as to give rise to prejudicial error. In *People v. Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153] where the court erroneously charged the jury that unconsciousness induced by voluntary intoxication would entitle the defendant to an acquittal, the defendant was found guilty of first degree murder. The court noted, ". . . the trial court's failure to instruct on involuntary manslaughter and its statement to the jury to acquit Ernest Shepard if it found he lacked any intent (i.e., was unconscious) at the time of the crime clearly prejudiced his defense of diminished mental capacity. His defense was his unconsciousness at the time of the crime. The trial court erroneously gave the jury, if it believed defendant's testimony at trial, the onerous alternative of acquitting defendant of all criminal activity. The erroneous instructions might well have led the jury to be unduly suspicious of Shepard's story; on the other hand, if the jury had been properly provided with the alternative of finding defendant guilty of involuntary manslaughter, we cannot say with certainty that it would not have been more favorably disposed towards defendant's asserted diminished mental capacity." (71 Cal.2d at p. 317, fn. 5.) So here defendant urges that the jury was faced with the alternative of acquitting the defendant if they found diminished capacity to premeditate or harbor malice, because no instructions were given on the nonstatutory manslaughters, and that therefore they were led into an erroneous verdict of second degree murder. Whatever merit there might be to defendant's argument if there were evidence of diminished capacity, is effaced by the lack of such evidence. Moreover, as noted above the jurors were not concerned with the defendant's mental state, except as it might have been affected by "heat of passion." The instructions on statutory manslaughter, in the light of the evidence, gave the jury ample opportunity to find lesser culpability if they had any reasonable doubt as to whether the homicide was committed with malice.

No prejudicial error is found in the failure to instruct on the manslaughter resulting from diminished capacity induced by voluntary intoxication.

## VII

At the conclusion of its instructions the court stated, "A number of forms of verdict have been prepared for the jury. These forms of verdict have been prepared solely for the convenience of the jury. No emphasis is intended by the Court in the sequence in which these possible verdicts are outlined to you, and no inference therefrom must be drawn by the jury." These verdicts respectively provided for the following findings: (1) "guilty of the crime of felony, to wit: Murder, a violation of Section

187 of the Penal Code of the State of California, as charged in the Information" with the degree to be fixed by the jury; (2) "not guilty of the crime of felony, to wit: Murder, a violation of Section 187 of the Penal Code of the State of California, as charged in the Information"; (3) "guilty of the crime of felony, to wit: Voluntary Manslaughter, a violation of Section 192, subd. 1, of the Penal Code of the State of California, an offense included within the offense charged in the Information"; and (4) "guilty of the crime of felony, to wit: Involuntary Manslaughter, a violation of Section 192, subd. 2, of the Penal Code of the State of California, an offense included within the offense charged in the Information."

Defendant contends that the court committed reversible error by failing to give the jury forms providing for verdicts of not guilty of voluntary and of involuntary manslaughter. He relies upon *People* v. *Schindler* (1972) 23 Cal.App.3d 369 [100 Cal.Rptr. 110] in which the jury was given four verdict forms similar to those given in this case, with the exception that the verdict of guilt of murder was limited to murder in the second degree (see 23 Cal.App.3d at p. 377). On that appeal, the second in the case, the error was not in the verdict forms, but in the trial court's oral instructions which attempted to guide the jurors' deliberations. These oral instructions were characterized as follows: "Putting these various instructions together it is plain that the jury was told that if it could not agree, one way or another, on the basic charge of murder, its only options were to find defendant guilty of voluntary or involuntary manslaughter." (23 Cal.App.3d at p. 378.) The court concluded: "The prejudicial effect of these instructions was obviously heightened by the fact that no forms of verdict finding the defendant not guilty of voluntary or involuntary manslaughter were furnished to the jury. True, it is 'no part of the duty of the judge to furnish forms of verdict to the jury.' (*People* v. *Hill,* 116 Cal. 562, 570 . . .) True further, that on the first appeal of this case it was held not to have been error to furnish the jury with a not guilty verdict only as to murder. (*People* v. *Schindler, supra,* 273 Cal.App.2d at p. 642.) It is, however, most definitely error to preclude the jury, by oral instructions, from finding the defendant not guilty of the lesser included offenses. In such a case there is no room for the presumption, referred to on the first appeal, 'that if a jury is properly instructed, it will reach a proper verdict and write one or ask for one irrespective of whether they have all the verdict forms.' (*People* v. *Schindler, supra,* 273 Cal.App.2d at p. 642.)" (*Id.*)

In this case the jurors were properly instructed that the defendant was presumed to be innocent and was entitled to an acquittal unless his guilt was proved beyond a reasonable doubt (CALJIC (rev. ed. 1958) No. 21

(rev.)); that if they were satisfied beyond a reasonable doubt that the killing was unlawful but had a reasonable doubt whether the crime was murder or manslaughter, they should find it was the latter (*id.*, instruction No. 305-AA (new)); and that if they were convinced beyond a reasonable doubt that the crime of murder had been committed but had a reasonable doubt as to the degree, they should find second degree (*id.*, instruction No. 305-A). The court made no comments to contradict the clear purport of these instructions. The matter is therefore governed by the opinion on the first appeal in *People* v. *Schindler* (1969) 273 Cal.App.2d 624 [78 Cal.Rptr. 633], where the court said, in answer to the contention made here, "The trial court gave the jury a verdict form for every possible verdict under the facts of the case. There were guilty verdict forms for murder and each of the necessarily included homicide crimes and a murder not guilty verdict form for the only crime that was charged. [¶] We find no error connected with the giving of verdict forms to the jury. In any event, the presumption is as stated in *People* v. *Hill*, 116 Cal. 562, 570 . . ., that if a jury is properly instructed, it will reach a proper verdict and write one or ask for one irrespective of whether they have all the verdict forms." (273 Cal.App.2d at p. 642. See also, in addition to *People* v. *Hill* (1897) 116 Cal. 562, 570 [48 P. 711], *People* v. *Sheldon* (1948) 84 Cal. App.2d 177, 183 [189 P.2d 816].)

The mere forms of verdict did not compel the jury to find either voluntary or involuntary manslaughter if it had a reasonable doubt whether murder was committed. If it had a reasonable doubt whether any crime was committed it could have completed the not guilty verdict, or if puzzled, asked for further instructions. Moreover, the question appears to be academic in the frame of reference of this case because the jury found that there was malice, and that murder in the second degree was committed. Any further verdict forms would have been superfluous.

## VIII

The court gave the following instructions with regard to the jurors' duty with respect to the severity of the offense: "When upon the trial of a charge of murder, the jury is convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant but has a reasonable doubt whether such murder was of the first or of the second degree, the jury must give to such defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." (See CALJIC (rev. ed. 1958) No. 305-A; cf. (3d ed. 1970) No. 8.71); and "If you are satisfied beyond a reasonable doubt that the killing was unlawful but you have a reasonable doubt whether the crime is murder or manslaughter, you must

give the defendant the benefit of such doubt and find it to be manslaughter rather than murder." (See *id.,* instruction No. 305-AA (new); cf. (*id.*) No. 8.72.)

Defendant construes these instructions as directing the jury to bring in a guilty verdict. He contends that it deprived the jury of its independence of decision, that is, the right to choose to not return a guilty verdict after considering all of the circumstances of the case, including proof of guilt beyond a reasonable doubt. No authority is cited for this acknowledgedly realistic but legally unsound proposition. (Cf. Pen. Code, § 1126; and see *People* v. *Meacham* (1948) 84 Cal.App.2d 193, 202-203 [190 P.2d 262].) In any event the questioned instructions were necessarily given pursuant to the provisions of section 1097 of the Penal Code with respect to degrees, and pursuant to case law with respect to included offenses. (See *People* v. *Dewberry* (1959) 51 Cal.2d 548, 555-557 [334 P.2d 852].) The court instructed generally on the presumption of innocence and reasonable doubt (CALJIC (rev. ed. 1958) No. 21 (rev.)), and followed the foregoing instructions with an instruction on unanimity, which referred to a verdict of innocence, as well as to different verdicts of guilt. There, therefore, is no room for the inference which defendant now attempts to draw from the instructions.

## IX

In instructing the jury the court defined murder generally and malice aforethought as follows: "Murder is the unlawful killing of a human being with malice aforethought. The word 'aforethought' means only that the intent must precede the act, as distinguished from afterthought. Aforethought does not imply deliberation or the lapse of considerable time. [¶] As used in connection with murder, malice may be either express or implied. Malice is express when there is an intention unlawfully to kill a human being. *Malice is implied when the killing results from an action involving a high degree of probability that it will result in death, which act is intentionally done for a base, antisocial motive and with a wanton disregard for human life or when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life.* [¶] The term 'malice' does not necessarily imply a preexisting hatred or enmity toward the person killed." (Italics added. See CALJIC (rev. ed. 1958) No. 301 (rev.); and cf. (3d ed. 1970) Nos. 8.10 and 8.11.)

After instructing the jurors that there are two degrees of murder and that it was their duty to determine the degree (*id.,* instruction No. 302; cf. latter instruction No. 8.70), the court defined first degree murder (*id.,* instruction No. 302-A as modified, and No. 303 (rev.); cf. latter instruc-

tion No. 8.20), and "deliberate" and "premeditate" in unpublished instructions. It cautioned the jury concerning the effect of diminished capacity to premeditate. (*Id.*, instruction No. 303-A (new); cf. latter instruction No. 8.77.) It then undertook to define murder in the second degree as follows: "Murder of the second degree is the unlawful killing of a human being with malice aforethought, when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation." (*Id.*, instruction No. 305 (rev.); cf. latter instruction No. 8.30.)

No instruction was given on second degree murder arising from killing in an unlawful act dangerous to life (*id.*, instruction No. 305.01 (new); cf. latter instruction No. 8.31) or arising from the commission of a felony inherently dangerous to human life (*id.*, instruction No. 305.02 (new); cf. latter instruction No. 8.32). The court did describe the effect of diminished capacity to harbor malice (*id.*, instruction No. 305.1 (new); cf. latter instruction No. 8.77), and the duty of the jurors to find a lesser offense if they entertained a reasonable doubt of the commission of a graver offense. (*Id.*, instructions Nos. 305-A, 305-AA (new), and 305-B (rev.); cf. latter instructions Nos. 8.71, 8.72, and 8.74.) It defined statutory voluntary and involuntary manslaughter. (*Id.*, instructions Nos. 308 (rev.), 308-A (rev.), 308-B (rev.), and 309 (rev.); cf. latter instructions Nos. 8.37, 8.40, 8.45 (rev.), and 8.46.)

The court continued and stated, "*If a person while committing a felony causes another's death, malice is implied,* and the crime is murder. If while committing a misdemeanor he causes another's death, there is no malice, and he is guilty only of manslaughter. [¶] There are many acts which are lawful but nevertheless endanger human life. If a person causes another's death by doing such a dangerous act in an unlawful or criminally negligent manner, without realizing the risk involved, he is guilty of manslaughter. *If,* on the contrary, *he had realized the risk and acted in total disregard of the danger to life involved, malice would be implied and he could be guilty of murder.*" (Italics added. See *id.*, instruction No. 310 (rev.); cf. latter instruction No. 8.51.)

■ Defendant contends that the references to implied malice which have been emphasized above were erroneous in that they permitted the jurors to find the malice requisite for first or second degree murder even though the fatal shot was fired without the actual malicious intent to kill. In *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323], the court held that it was error to give an instruction providing that " 'the unlawful killing of a human being with malice

aforethought is murder of the second degree . . . when the killing is a direct causal result of the perpetration . . . [of] a felony inherently dangerous to human life, such as an assault with a deadly weapon.' " (70 Cal.2d at p. 538.) (See CALJIC (rev. ed. 1958, No. 305 (rev. [1967]); and cf. *id.*, No. 305.02 (new [Dec. 27, 1968]) and *id.* (3d ed. 1970) No. 8.32.) The court concluded, "To allow such use of the felony-murder rule would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault—a category which includes the great majority of all homicides. This kind of bootstrapping finds support neither in logic nor in law. We therefore hold that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." (70 Cal.2d at p. 539, fn. omitted.) (See also *People v. Satchell* (1971) 6 Cal.3d 28, 34 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383]; *People v. Sears* (1970) 2 Cal.3d 180, 185-189 [84 Cal.Rptr. 711, 465 P.2d 847]; and *People v. Wilson* (1969) 1 Cal.3d 431, 437-442 [82 Cal.Rptr. 494, 462 P.2d 22]. Cf. *People v. Mattison* (1971) 4 Cal.3d 177, 184-186 [93 Cal.Rptr. 185, 481 P.2d 193].) It is also error to give a comparable instruction, even though the defendant was engaged in the commission of a felony at the time of the homicide, unless the felonious act is one which "viewed in the abstract" is an offense inherently dangerous to human life. (*People v. Lopez* (1971) 6 Cal.3d 45, 51-53 [98 Cal.Rptr. 44, 489 P.2d 1372]; and *People v. Satchell* (1971) 6 Cal.3d 28, 35-43 [98 Cal.Rptr. 33, 489 P.2d 1361, 50 A.L.R.3d 383].)

In this case the references to felony second degree murder were only tangential. There was no instruction directing the jury's attention to a particular felony, such as assault with a deadly weapon or any other felony which might either be an offense which was an integral part of the homicide, or which, although a felony, was not in the abstract inherently dangerous to human life. It is concluded that in viewing the instructions as a whole, the jurors were not relieved of the necessity of making a specific finding of malice aforethought before returning a verdict of second degree murder. It may be observed that in both *People v. Lopez, supra* (6 Cal.3d at p. 48), and *People v. Satchell, supra* (6 Cal.3d at p. 31), the court noted that the trial court had given the general instruction found in CALJIC (rev. ed. 1958) No. 301 (revised) (see Pen. Code, § 188, and CALJIC (3d ed. 1970) Nos. 8.10 and 8.11), which contains the general description of implied malice to which defendant now objects. No criticism was directed at that general instruction, although the court in the *Satchell* case (6 Cal.3d at p. 32) did single out that portion of CALJIC No. 310 (revised), which,

in distinguishing manslaughter from murder, generally refers to the implication of malice from a homicide caused in the commission of a felony. (Cf. CALJIC (3d ed. 1970) No. 8.51 which defines the type of felony more accurately.)

Defendant not only attacks that part of the instructions which refers to the implication of malice from the commission of a felony, but also the references to the implication of malice from the nature of the act itself. In *People* v. *Mattison, supra,* the court observed, "It is true that murder may be committed without express malice, i.e., without a specific intent to take human life. To be so committed, however, unless the felony-murder rule is applicable, 'the defendant must intend to commit acts that are likely to cause death and that show a conscious disregard for human life.' (*People* v. *Thomas* (1953) 41 Cal.2d 470, 479 . . . (concurring opinion).) In other words, to make possible a conviction of murder based on implied malice, there must first be a finding that 'although there was no deliberately formed and premeditated intent to kill, the killing proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' (*People* v. *Phillips* (1966) 64 Cal.2d 574, 587 . . . .)" (4 Cal.3d at pp. 182-183.) On analysis the foregoing, although termed implied malice, is in truth a form of manifestation of malice, in which the malicious purpose and intent to take life are properly inferred from the intent to commit an act which in all probability will result in the taking of life. Under those circumstances the jurors are not relieved of the responsibility of finding a requisite mental intent, nor is the application of the defense of diminished capacity eviscerated (see *People* v. *Ireland, supra,* 70 Cal.2d at p. 539, fn. 13), because the jurors must examine the accused's mental state to determine his intent to commit the underlying act and his understanding of the consequences of that act. In *People* v. *Wyatt* (1972) 22 Cal.App.3d 671 [99 Cal.Rptr. 674], unlike this case, an instruction was given in the express language of CALJIC (rev. ed. 1958) No. 305.01 (new) (see (3d ed. 1970) No. 8.31).[7] The court concluded, "This instruction does not suffer from the same objection as does the instruction given in *People* v. *Ireland,* 70 Cal.2d 522, 538 . . ., and *People* v. *Wilson,* 1 Cal.3d 431, 437-438 . . ., upon which appellant relies, for it does not relieve the jury of finding

---

[7]This instruction reads: "Murder of the second degree is [also] the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life. [¶] When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

the defendant acted with malice aforethought. 'When a defendant " 'with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death,' " he acts with malice aforethought.' (*People* v. *Conley, supra,* 64 Cal.2d at p. 321 [49 Cal.Rptr. 815, 411 P.2d 911].) Thus, under the questioned instruction, the jury would have to find the appellant acted with malice to find him guilty of second degree murder resulting from an act dangerous to life." (22 Cal.App.3d at p. 679.)[8]

There was no error in the instructions given by the court on the issue of the malice necessary for murder, whether of the first or second degree.

## X

In connection with the first proceedings under Penal Code section 1368 to determine defendant's mental capacity to undergo trial, one examining psychiatrist reported, "He said that he was down on 7th Street in West Oakland. He had been drinking and he had dropped some 'Reds' (Seconal, a barbiturate) . . . He denies hearing voices and said he only had imaginations when he shot dope like crystals, Heroin, Morphine, or when he took 'Reds.' He said that he liked to drop pills, but had never bothered to use LSD . . . His story that he was drinking and had dropped some Reds and therefore doesn't remember anything until the police were questioning him appears a bit pat . . . Unless his behavior in the interview was due to being 'high' on contraband narcotics — which is sometimes possible in the jail—I would have to say . . . he has some diminished capacity to adhere to the right. Since I have only his statement that he was 'out of it' at the time of the alleged crime, I cannot render any judgment as to the nature of his mental state at the time of the offense . . .

---

[8]In *People* v. *Poddar* (Cal.App. 1972) 103 Cal.Rptr. 84 (vacated by grant of hearing by Supreme Court Sep. 7, 1972), the court declined to follow *People* v. *Wyatt, supra,* and stated, "We are aware that our reasoning conflicts with that of the court in *People* v. *Wyatt,* 22 Cal.App.3d 671, 679, . . . Wyatt, who asserted diminished capacity because of intoxication imposed on paranoid tendencies, had fired six shots into the victim. On appeal, the court sustained CALJIC No. 8.31 on this syllogistic pattern: One is guilty of malice aforethought who with wanton disregard for human life does an act that involves a high degree of probability that death will result (citing *People* v. *Conley,* 64 Cal.2d 310, 321, . . .). But one who kills with malice aforethought is guilty of murder. Therefore, etc. [¶] The difficulty is with the generality of the application of the major premise. Our thought is that the major premise does not apply where the act dangerous to life is the mortal act itself. If this were not so, in cases where diminished capacity is asserted, that defense would be unjustifiably enfeebled." (103 Cal.Rptr. at pp. 92-93, fn. omitted.) Defendant's reliance upon this reasoning is rejected. Even if this court agreed, it would not be applicable to this case, because the instructions as a whole fail to reveal a direct instruction on second degree murder such as was authorized in *Poddar.*

While I believe that he is technically sane at the present time, I believe that he is a borderline psychotic individual and that he probably falls within the category of schizophrenic reaction chronic undifferentiated with possible organic brain damage . . ."

The second doctor stated: "The behavior of Cisneros is slightly weird and bizarre. He may be somewhat delusional . . . Some of the defendant's actions are schizoid. This is a partial response and probably a reaction to arrest and incarceration. This reaction should clear rapidly following disposition of the case. There is the outside chance that his behavior is due to heroin and dangerous drug use. In the inner aspect of his left arm there is an old scar. This may have resulted from repeated needle injections."

After his second examination the first psychiatrist wrote: "I asked what his present attitude was and he answered that he didn't commit the crime. I asked him if he thought he was insane at that time and he said: 'I was drinking and dropping Barbiturates.' . . . There is no evidence of psychosis at the present time . . . His present behavior makes me feel even more strongly that he was under the immediate and actual influence of some drug at the time of my previous examination . . . He could be a borderline psychotic individual, but he certainly shows no clear evidence of that in the present setting . . . I can offer no more conclusions now than I could at the time of the previous examination as to whether he was in possession of his faculties at the time of the alleged offense. He vacillates between saying he knows he didn't do it and saying he doesn't know if he did it. I know of nothing which would substantiate his claim that he was so much under the influence of these drugs as to render him unaware of the nature and quality of his acts."

The third doctor reported, "Mr. Cisneros . . . vehemently denies guilt in the murder case saying the Negro he was with, Willie, is lying probably to save his own neck. Cisneros maintains he never had a gun in his possession at any time, that although he states he had been drinking and taking reds (seconal). However he says that he was conscious at the time it is alleged the incident occurred and knew what was going on. . . . [¶] Mental examination shows no evidence of mental illness at this time and neither does it indicate that he was mentally ill at the time of the shooting. There is no history suggestive of epilepsy or unconscious episodes. He evinces no psychotic thinking or any experiences in which he felt he was controlled or directed by any mystic, electric, hypnotic or other unusual powers or influences. He understands the nature and possible consequences of his present situation, knows and has always known that it was wrongful, unlawful and punishable to shoot or kill another person. There is no mental condition present that would have precluded him from knowing that to

kill was against the law at the time of the homicide or which would have precluded him from being able to differentiate between right and wrong relative thereto. There were no memory defects noted."

 Defendant now contends that he was denied a fair trial because his counsel failed to present and develop the defense of diminished capacity. (See *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464-466 [34 Cal.Rptr. 863, 386 P.2d 487]; and *People* v. *Williams* (1971) 22 Cal.App.3d 34, 50 [99 Cal.Rptr. 103].) His argument rests on the hypothesis that the report of the first psychiatrist reflects that there was evidence of diminished capacity. Viewed as a whole the reports filed by the psychiatrists, whether considered singly or jointly, fail to show that defendant lacked the requisite mental state for murder at the time of the offense. From all that appears, the defense may have consulted the unnamed psychiatrist mentioned at the May hearing (see part I above) and obtained a similar conclusion. The evidence of intoxication was inadequate to raise the defense (see part VI above). The defendant admitted to one doctor that he knew what was going on. The decision as to whether he should take the stand and by his own testimony put his mental state in issue was solely a tactical one. Under those circumstances trial counsel cannot be faulted for failure to press further what in all probability was a nonexistent defense. (See *People* v. *Fain, supra,* 70 Cal.2d 588, 600; *People* v. *Cram, supra,* 12 Cal.App.3d 37, 45-46; and *People* v. *Robinson, supra,* 5 Cal.App.3d 43, 49-50.) Defendant has failed to show that his trial was reduced to a farce or sham because of the inadequacy of his counsel.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.